BROOKLYN UNION GAS CO. v.
PRENDERGAST et al.

(District Court, E. D. New York. June 24, 1925.)

No. 1269.

1. **Public service commissions** ⊚—2—**Statutes** ⊚—149 — **Power of Legislature, to authorize commission to contract as to rates of public utility, limited by considerations that that regulation is exercise of police power, and that one cannot control subsequent one in its exercise.**

Power of Legislature to authorize Public Service Commission to contract as to rates to be charged by a public utility is limited by the considerations, that regulation of such rates is an exercise of the police power, which cannot be impaired or limited by contract, and that one Legislature cannot limit or control a subsequent one in its exercise.

2. **Public service commissions** ⊚—7—**Power to contract as to rates must be in express grant.**

Any authority of Public Service Commission to contract on behalf of state as to rates to be charged by public utility must be in express grant, as it will not be implied.

3. **Gas** ⊚—14(1)—**Public Service Commission not authorized to contract for gas rates for definite time.**

Public Service Commission Law N. Y. §§ 22, 65, 66, 72, empowering commission, created by the act, to fix standard of purity of gas from time to time, and to fix maximum rates by order for a term not exceeding 3 years, but also empowering it to change or abrogate both classes of orders on rehearing, does not authorize it to make any contract for rates for any period which cannot be abrogated by it or the Legislature.

4. **Gas** ⊚—14(1)—**Company, by expenditures in adjusting appliances to commission's orders, cannot postpone regulation of rates.**

A gas company, by making expenditures in adjusting appliances to meet conditions created by commission's change of standard for gas, cannot prevent or postpone exertion by the state of power to regulate rates.

5. **Gas** ⊚—14(1)—**Orders of commission and acceptance by company held not to constitute a contract for rates for definite time.**

Orders of Public Service Commission fixing standard of gas and fixing maximum rate for a year, and company's acceptance thereof, each reserving the right to recede therefrom, *held* not to create a contract for fixed rate for definite time.

6. **Constitutional law** ⊚—48—**Rate-fixing statute presumed constitutional.**

The Legislature, in passing statute fixing gas rates, is presumed to have acted within its powers, so those seeking to enjoin enforcement of it as confiscatory must prove its unconstitutionality beyond a reasonable doubt.

**7. Gas ⊜⇒14(1)—Experiment with statutory rate unnecessary if confiscatory.**

Statute fixing maximum gas rate may be declared confiscatory, and its enforcement enjoined without experiment with rate, where it is so low that on any reasonable basis of valuation it is undoubtedly confiscatory.

**8. Gas ⊜⇒14(1)—$1 rate prescribed for New York city shown confiscatory, without necessity of experiment.**

Plaintiff *held* to have shown by evidence, without necessity of experiment, that $1 maximum rate prescribed by Laws N. Y. 1923, c. 899, for gas companies in New York City, is confiscatory.

**9. Gas ⊜⇒14(1)—Nonexclusive franchises of vendor companies not to be given value in fixing rate base of purchasing company.**

Gas company purchasing under Laws N. Y. 1890, c. 564, § 33, as added by Laws 1893, c. 638, § 1, property, franchises, and rights of other gas companies, all the corporations remaining in existence, may not have the value of the purchased franchises included in making up its rate base; they being nonexclusive, and vendor companies having paid nothing therefor to the franchise granting power.

**10. Constitutional law ⊜⇒70(1) — Province of court only to determine whether rates prescribed are confiscatory.**

Courts may not prescribe rates for public utilities, but only determine whether those sought to be enjoined are confiscatory.

**11. Public service commissions ⊜⇒22—Fair value of utility's property used and useful in serving public basis for fair return.**

In determining whether prescribed rates are confiscatory, the fair value of utility's property used and useful in serving public is to be ascertained; it being on that that it is entitled to fair return.

**12. Public service commissions ⊜⇒7—Matters to be considered in determining fair value of utility's property as rate base enumerated.**

Matters which, if ascertainable, are, in addition to cost of replacement less depreciation, to be considered in determining utility's rate base, enumerated.

**13. Constitutional law ⊜⇒277(1)—Deprivation of property, and not of original cost, prohibited.**

It is property, and not its original cost, of which owner may not be deprived.

**14. Public service commissions ⊜⇒7—For rate base, value of property in present money to be determined.**

In arriving at rate base of public utility, value of its property in present money is to be determined.

**15. Public service commissions ⊜⇒22—In view of deductions made, absence of finding of depreciation immaterial.**

That master, in suit attacking rate as confiscatory, did not make finding of depreciation in items of replacement in public utility's plant may not be complained of; his findings of fair value and cost of replacement showing he made all allowance for depreciation warranted by evidence.

**16. Evidence ⊜⇒571(7)—Court may consider testimony in light of cross-examination.**

Though defendants, in injunction suit based on rate prescribed for plaintiff public utility being confiscatory, by their experts gave no evidence as to value, yet, they having cross-examined plaintiff's experts, the court is not bound to accept their testimony and allow the amounts testified to by them, but may consider their testimony in the light of the cross-examination, and accord to it such weight as it deems proper.

**17. Public service commissions ⊜⇒22—Court's duty to give individual judgment on exceptions to master's findings.**

On exceptions to findings of master as to various items in public utility rate case, it is the court's duty to give its individual judgment, and so to examine the evidence.

**18. Public service commissions ⊜⇒22—Assessed value for taxation, improperly admitted on determination of rate base.**

Assessed values for purpose of real estate taxation of land and buildings of public utility *held* improperly admitted in determining utility rate base.

**19. Public service commissions ⊜⇒22—What defendants may consider effective substitute for property used, where matter of speculation, not considered on rate base.**

In fixing rate base in public utility's injunction suit based on claim of confiscatory rate, the court is to find fair value of property devoted by utility to public service, and not value of what defendants may consider an effective substitute, where this is a matter of speculation.

**20. Gas ⊜⇒14(1)—Cost of operation based on cost at all of company's plants.**

The cost of operation of a gas company operating several plants is to be based on costs of all of them, though the costs are not uniform; all the plants being efficiently operated, though they are not equally well equipped.

**21. Gas ⊜⇒14(1)—Unaccounted for gas allowed for on basis of experience of company and not at arbitrary figure.**

Unaccounted for gas, due to leakage, condensation, expansion, contraction, etc., should be allowed for on basis of experience of the company, and not at an arbitrary figure.

**22. Gas ⊜⇒14(1)—Special abnormal expenditures not considered as part of cost of manufacture.**

Where question is whether prescribed gas rate is confiscatory, sum spent by company in adjusting appliances to meet commission's order as to standard of gas, and estimated cost of action to enjoin enforcement of rate, being abnormal expenditures, should not be regarded as part of cost of manufacture.

**23. Public service commissions $\Longleftrightarrow$22—Items of uncollectible bills and gross earning tax allowed on question of rate.**

Items of uncollectible bills and gross earnings tax are properly allowed in determining question of rate for public utility being confiscatory.

**24. Gas $\Longleftrightarrow$14(1)—Nothing for correction in company's loaning money to another to build container and then paying higher rate for use of the container.**

That the B. gas company, which furnishes gas to the N. gas company to distribute to its customers, loans to it money at 6 per cent. to build a container, and then uses the container and pays 8 per cent. for its use, presents nothing requiring correction.

**25. Gas $\Longleftrightarrow$14(1)—Proper rate of return 8 per cent.**

On evidence, proper rate of return for gas company at present *held* 8 per cent.

**26. Gas $\Longleftrightarrow$14(1)—$1 rate held confiscatory as to plaintiff.**

$1 rate provided by Laws N. Y. 1923, c. 899, as maximum for New York City gas companies, is confiscatory as to plaintiff; it not allowing it a return even approximating 6 per cent. at any standard.

**27. Statutes $\Longleftrightarrow$64(2)—Provisions as to rate for and standard of gas not separable.**

Provisions of Laws N. Y. 1923, c. 899, as to rate for and standard of gas for companies in New York City *held* not separable.

In Equity. Action by the Brooklyn Union Gas Company against William A. Prendergast and others, constituting the Public Service Commission of New York, and another. On motion of plaintiff to sustain exceptions to report of Special Master, and for final decree. Report modified and confirmed, and decree for plaintiff.

The opinion of the special master, Almet Reed Latson, is as follows:

The plaintiff was incorporated in September, 1895, under the Transportation Corporations Law (Consol. Laws, c. 63) of the state of New York, for the purpose of manufacturing and supplying gas in what is now the borough of Brooklyn, city of New York. At that time the community in question, then the city of Brooklyn, was being served with gas by various corporations, among them the following seven, namely: The Nassau Gaslight Company, the People's Gaslight Company, the Metropolitan Gaslight Company, the Williamsburg Gaslight Company, the Brooklyn Gaslight Company, the Fulton Municipal Gas Company, and the Citizens' Gas Company. These corporations were in active competition, with the result that the territory served by one had been invaded by another and, in some instances, by others, so that in some streets two mains existed and in others three or even four. Competition took the form of what has been called a "rate war"; the competing companies offering service at rates designed to attract patronage from a competitor.

Plaintiff corporation seems to have been organized for the express purpose of acquiring the properties of these competing corporations. That purpose was consummated on the 4th day of November, 1895. The process was simple. The plaintiff purchased the assets of these several corporations. The purchase price consisted of stock and bonds of the newly organized plaintiff corporation. These purchases were preceded by appropriate resolutions of the board of directors of each corporation, and it would appear that a committee from the board of directors of each corporation made investigation and report, so that the purchase price ultimately agreed upon was the result of negotiation. Exhibits 84 to 90 inclusive. When these several transactions had been consummated, the vendor corporations were thereby divested of all assets, tangible and intangible, except the bonds and the shares of stock of the plaintiff corporation which had been issued to them, respectively, as a purchase price. The plaintiff corporation, on the other hand, had become possessed of the tangible and intangible assets of these seven vendor corporations. Thereupon each of the vendor corporations distributed among its stockholders the stock and bonds received from the plaintiff corporation, and each became an empty corporate shell, without assets or liabilities, and as such ceased to function or exercise its corporate powers. From and after the 4th day of November, 1925, the plaintiff served the community with gas, and continues so to do.

A little more than a year after these transactions had been thus consummated, such proceedings were had before the Attorney General of the state of New York that actions were commenced in the name of the people to procure a decree dissolving each of these seven vendor corporations. On the 10th day of December, 1896, there was entered in each action a decree dissolving the corporation therein defendant upon the ground of nonuser in having failed to exercise its corporate powers for one year then last past and having disposed of all of its property and assets. We may suspend the statement of facts at this point, for the purpose of considering one of the contentions of the plaintiff, which has been very earnest-

ly urged upon its behalf and as earnestly combatted on behalf of the defendants.

Plaintiff contends that the franchises possessed by these several vendor corporations, and which were so as aforesaid acquired by the plaintiff corporation, should find a place among other assets of the plaintiff corporation, used and useful in its business, and that the fair value of the same should be included in arriving at a rate base for the purposes of this action.

It is urged by the learned counsel for the plaintiff that a franchise to occupy the public highways to the extent necessary to lay and maintain mains and services constitutes property which would survive the dissolution of the corporation possessing the same, citing People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; that it is property, the acquisition of which will support the issue of capital stock, citing Rafferty v. Buffalo City Gas Co., 37 App. Div. 618, 56 N. Y. S. 288; that it is property which may be the subject-matter of a special franchise tax under the Tax Law of the state of New York (Consol. Laws, c. 60), citing People ex rel. Metropolitan Street Railway Co. v. State Tax Commission, 199 U. S. 1, 25 S. Ct. 705, 50 L. Ed. 65, 4 Ann. Cas. 381. All this may be conceded; yet the general rule seems well established that, despite the fact that franchises are property for such purposes, no valuation upon the same should be included in the rate base beyond such amount as may have been paid for the same to the franchise granting power. Spring Valley Waterworks v. City of San Francisco (C. C.) 192 F. 137; Cumberland T. & T. Co. v. City of Louisville (C. C.) 187 F. 637; Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655 (see page 699) 32 S. Ct. 389, 56 L. Ed. 594; Des Moines Gas Co. v. Des Moines, 238 U. S. 153 (see page 169) 35 S. Ct. 811, 59 L. Ed. 1244; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678.

Nowhere have I been able to find authority for the proposition that, where a franchise obtained from the state shall have acquired great value as a result of its demonstrated earning power by way of operation thereunder, in rate cases such a franchise, although property, may in turn be given a value consistent with such earning power for the purpose of asserting a constitutional obligation to protect a capitalization based thereon.

Plaintiff has shown by appropriate evidence that in these transactions a valuation was given to these several franchises, and that the purchase price in stock and bonds paid by the plaintiff for all property so acquired included that valuation. Plaintiff has further shown that, immediately after acquiring these franchises, namely, November 4, 1895, same were entered upon their books as capital assets at a valuation of $3,050,000. Plaintiff called an expert witness, who testified that, in his opinion, these franchises at that time had a value of $6,000,000, and that, in his further opinion, the valuation entered upon the books of the plaintiff was conservative. See Plaintiff's Exhibit 283. It is therefore argued that upon the sum at which these franchises were valued in 1895 the plaintiff may now assert a right to return and, to that extent, that they fall within the rule and should be allowed at the valuation thus ascertained. If there had been no such transfers, and one of the vendor corporations, say the Nassau Gaslight Company, for example, were now before the court as plaintiff in this action, it is clear that, under the authorities cited above, no such allowance would be made to it beyond the amount which it could show had been paid to the state or municipality for the franchise in question. I am unable to see how the plaintiff, as the grantee of the company which I have chosen for illustration, is in any better position than its grantor. An assignee stands in the shoes of his assignor. A contrary view would lead to the conclusion that, while the original recipient of a franchise from the state might not thus include its valuation for rate-making purposes beyond the amount paid for the franchise, yet, if only it can perfect a conveyance of that franchise, the grantee may include the same at whatever valuation can be established as of the date of conveyance. If such a view be sound, the rule is of little value and its effect is easily evaded.

The plaintiff, however, further contends that, even though such a rule prevail, yet the transaction under which these franchises were acquired constitutes a "consolidation" analogous to that considered by the United States Supreme Court in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas 1034. In that case the record before the court disclosed that the Consolidated Gas Company was incorporated under the laws of the state of New York in the year 1884; that shortly thereafter, and in the same year, the Legislature of the state of New York enacted chapter 367 of the Laws of 1884, which authorized corporations en-

gaged in manufacturing to consolidate; that the statute (section 1) further permitted the issuance of capital stock by the consolidated corporation not "larger in amount than the fair aggregate value of the property, franchises and rights of the several companies thus to be consolidated"; that the statute further prescribed a means of ascertaining the fair aggregate value of those properties, franchises, and rights, namely, through action of the directors of the various companies supplemented by the approval of the stockholders in each instance; that the Consolidated Gas Company of New York availed itself of this statute, and six gas companies in the city of New York were consolidated into the Consolidated Gas Company of New York; that, as an incident of this consolidation, the franchises and rights of the constituent companies received a valuation ascertained by the method prescribed in the statute amounting to $7,781,000; that capital stock of the consolidated corporation was issued accordingly; that in the following year, 1885, the Legislature of the state of New York appointed a committee to investigate the capitalization of this corporation, and concluded that this "state of facts cannot be called a violation of the law that expressly authorized it to be done unless such valuation was too high." The Supreme Court of the United States said:

"We think that under the above facts the courts ought to accept the valuation of the franchises fixed and agreed upon under the Act of 1884 as conclusive at that time. The valuation was provided for in the act, which was followed by the companies, and the agreement regarding it has been always recognized as valid, and the stock has been largely dealt in for more than twenty years past on the basis of the validity of the valuation and of the stock issued by the company."

The court, however, was at great pains to indicate that the allowance in this case was not to be interpreted as in any sense an invasion or abrogation of the general rule to the contrary. We quote:

"What has been said herein regarding the value of the franchises in this case has been necessarily founded upon its own peculiar facts, and the decision thereon can form no precedent in regard to the valuation of franchises generally, where the facts are not similar to those in the case before us. We simply accept the sum named as the value under the circumstances stated."

That the facts referred to by the Supreme Court render that case sui generis is a view generally adopted (Lincoln Gas & Electric Co. v. City of Lincoln [C. C.] 182 F. 926; Bronx Gas & Electric Co. v. Public Service Commission, 190 App. Div. 13, 180 N. Y. S. 38; Georgia Railway & Power Co. v. Railroad Commission [D. C.] 278 F. 242), and the Supreme Court itself, speaking through Mr. Justice Brandeis has stated:

"The allowance for the franchise, made in Willcox v. Consolidated Gas Co., 212 U. S. 19, 43, 44, 48 [29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034], was rested on special grounds which do not exist in this case." Georgia Railway & Power Co. v. Railroad Commission of the State of Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144.

The statute to which the Supreme Court referred, and under which the plaintiff corporation thus operated, namely, chapter 367 of the Laws of 1884, was repealed by chapters 563 and 567 of the Laws of 1890. It becomes important, therefore, to note whatever points of differentiation as well as whatever points of analogy may be found when comparing the status of this plaintiff with the status of the Consolidated Gas Company as disclosed to the Supreme Court.

It is conceded that what was done was lawful and fully authorized by the statutes then in existence. At the time of the transaction in question one statute (section 13 of chapter 567 of the Laws of 1890 [Business Corporations Law]) authorized a "consolidation" of such corporations, while another statute authorized a "merger" (section 58 of chapter 564, Laws of 1890 as added by Laws 1896, c. 932, § 1 [Stock Corporations Law]), while still another statutory provision authorized a simple "purchase" by one corporation of the property, rights, and franchises of another (section 33, c. 564, Laws of 1890 as added by Laws 1893, c. 638, § 1 [Stock Corporations Law]). In each transaction the statutes nominated different procedure and declared different rights. Under a "consolidation" of these seven corporations, the resultant would have been a new corporation entirely supplanting the seven thus consolidated. The result of a "merger" would have been the survival of one and the obliteration of the other six. Irvine v. New York Edison Co., 207 N. Y. 425, 101 N. E. 358, Ann. Cas. 1914C, 441. In the procedure adopted by plaintiff, it simply acquired by conveyance the property, franchises, and rights of seven other corporations. When the transaction had been completed, eight corporations sur-

vived. The survival of the seven vendor corporations is conclusively evidenced by the fact that the Attorney General of the state of New York instituted an action in the name of the people of the state of New York to dissolve the same upon the ground of nonuser, and these actions resulted in the familiar decree of dissolution. The statute under which the plaintiff was operating described no method of procuring a valuation upon the franchises conveyed, nor did it authorize the issue of capital stock either to a specific amount or to an amount ascertainable through a nominated procedure, or for specific property, tangible or intangible. The transaction possessed no features other than a simple conveyance by one corporation to another. Whether or not a different situation would have been created had the plaintiff operated under the statutes authorizing "consolidation" or authorizing "merger" need not be considered. The fact remains that the corporations were not consolidated, nor were they merged. I note only one important feature where the analogy seems at all apparent, namely, in neither case was capital stock issued specifically for franchises acquired. We quote the conclusion of the Supreme Court in that regard with reference to Consolidated Gas Company:

"It is not, of course, contended there were special stock issued for this particular item, but it was included in the total sum for which the Consolidated Company issued its stock and upon its receipt the stockholders in the various companies surrendered their stock in those companies. The result was that the amount of the stock issued by the Consolidated Company was increased by $7,781,-000, representing a value of franchises which was agreed upon by the stockholders of the companies, and which had never cost any of them a single penny."

In the instant case substantially the same statement may be made; namely, that no capital stock of the plaintiff corporation was issued for the particular item of franchises and rights, but was included in the total sum for which the plaintiff corporation issued its stock. The result was substantially the same; namely, that the amount of stock issued by the Brooklyn Union Gas Company was increased by an amount representing a value of franchises which was covered into the transaction and which, so far as the record discloses, had never cost any of the seven corporations a single penny. To this may be added the further fact that the stock so issued "has been largely dealt in for more than twenty years past on the basis of the validity of the valuation of the stock issued by the company."

In view of the precise limitations which the Supreme Court has thrown about its decision in the Consolidated Gas Company Case, and the strict construction which has since been given to that decision by other tribunals, and as a result of my own analysis of the situation, I am led to the conclusion that no authority exists to sustain the proposition that in the instant case a valuation of these franchises can be lawfully included in the items going to make up the rate base.

I now resume the statement of facts. Having thus acquired these properties, the plaintiff proceeded to exercise its corporate powers and franchise rights. At that time gas was used mainly for illuminating purposes. From time to time a minimum price of gas, together with an illuminating standard of purity, was prescribed by the appropriate authorities. Gradually the use of gas for illuminating purposes decreased, and its use as fuel increased, with the result that, at the time the statute under consideration was enacted, an illuminating standard had been abandoned and a thermal standard substituted.

In the meantime a Public Service Commission had been created by the Legislature of the state of New York, and the plaintiff, among other utilities, had passed under the jurisdiction of that commission. In the year 1921 the Public Service Commission instituted an inquiry into rates and standards, and such proceedings were had that on August 30, 1922, the commission made its order fixing $1.15 per thousand cubic feet as the maximum price to be charged by the plaintiff (see Plaintiff's Exhibit 68), and its further order changing the standard of gas from an illuminating standard of 22 candle power to a minimum thermal standard of 537 British thermal units per cubic foot (see Plaintiff's Exhibit 80). These orders were made applicable to the plaintiff corporation and its subsidiary companies. By the terms of the order fixing the maximum price of gas at $1.15 per thousand cubic feet it was further provided that this price should remain in operation for a period of one year from October 1, 1922. The evidence submitted by the plaintiff establishes the fact that, after this order of the commission had been made and before it became operative the intervening time was utilized for the purpose of adjusting the appliances

used by the consumers of gas as well as those used in the process of manufacture so as to produce gas of the thermal standard thus prescribed, and that this readjustment required the expenditure of substantial sums of money on the part of the plaintiff. While these orders of the Public Service Commission were in full force and effect, and before the expiration of the year prescribed by the order fixing the maximum price of gas, namely, in the month of May, 1923, the Legislature passed the statute in question. The statute became a law on the 2d day of June, 1923, and contained the provision that it should take effect immediately.

It is this phase of the situation upon which plaintiff predicates its contention that at the time the statute in question was enacted these orders of the Public Service Commission, together with the acceptance thereof by the plaintiff, and the expenditure of moneys in reliance thereupon, constituted a contract between the plaintiff corporation and the state of New York, the obligation of which contract has been violated by the statute in question. Manifestly, if the contention of the plaintiff be correct, it would become unnecessary for the court to determine whether or not the statute was confiscatory, although under the terms of the order of appointment the special master is required to consider and report upon that contention.

The regulation of rates to be charged by a public utility is concededly an exercise of the police power of the state, "customary in England from time immemorial, and in this country from its first colonization." Munn v. People of Illinois, 94 U. S. 125 (24 L. Ed. 77).

It is equally authoritative that "a Legislature cannot bargain away the police power, nor in any wise withdraw from its successors the power to take appropriate measures to guard the safety, health, and morals of all who may be within their jurisdiction." Texas & N. O. R. Co. v. Miller, 221 U. S. 408, 31 S. Ct. 534, 55 L. Ed. 789.

It follows that "regulations regarding rates which municipalities may impose in granting licenses or permission to use its streets by public service corporations cannot be said to form contracts beyond the inherent police power of the Legislature to modify for the public welfare." These regulations therefore "may be modified without impairing the obligation of a contract within the provisions of the Constitution." People ex rel. Village of South Glens Falls v. Public Service Commission, 225 N. Y. 216, 121 N. E. 777.

The same doctrine has been differently expressed but substantially to the same effect: "Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to defeat the legitimate government authority." Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420. The state, acting through the Legislature, has, by virtue of its police power, the right to regulate the fare to be charged by a street surface railroad corporation. This right or power, whichever it may be called, is an attribute of state sovereignty. It is something which the state cannot sell or give away, either in whole or in part. It is a power which underlies the Constitution and is predicated upon the law of necessity. It belongs to the state because it is sovereign, and is a necessity for the existence of the government. It is something the state cannot surrender, because to do so would be to surrender a sovereign power. It is as enduring and indestructible as the state itself. People v. Adirondack Railway Co., 160 N. Y. 225, 54 N. E. 689.

Or again: "All contract and property rights are held subject to its fair exercise" of this power, which embraces, among other things, "regulations designed to promote public convenience or general welfare, as well as those in the interest of the public health, morals, or safety." Chicago & Alton Railroad Co. v. Tranbarger, 238 U. S. 67, 35 S. Ct. 678, 59 L. Ed. 1204.

This is clearly the well-established law, and in the case last cited was summarized as follows with reference to these same constitutional questions:

"It is established by repeated decisions of this court that neither of these provisions of the federal Constitution has the effect of overriding the power of the state to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community, that this power can neither be abdicated nor bargained away, and is inalienable even by express grant, and that all contract and property rights are held subject to its fair exercise." Atlantic Coast Line v. Goldboro, 232 U. S. 548, 558, 34 S. Ct. 364, 368 (58 L. Ed. 721) and cases cited.

Within this area, and subject to such limitation, it was competent for the state to empower the Public Service Commission to contract on its behalf. The extent to which the Public Service Commission was

as matter of fact thereunto authorized will appear from an examination of the statute creating that commission and the amendatory acts. Chapter 48 of the Consolidated Laws.

The commission is a regulatory body, and the authority to contract on behalf of the state will not be implied, but must be found in some express grant. Milwaukee Electric Railway & Lighting Co. v. Railway Commission of Wisconsin, 238 U. S. 174, 35 S. Ct. 820, 59 L. Ed. 1254.

"Surrender, by contract, of a power of government, though in certain well-defined cases it may be made by legislative authority, is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized." Home Telephone & Telegraph Co. v. Los Angeles, 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176.

As originally enacted, the Public Service Commission Law created a commission and prescribed "general provisions" with reference to the jurisdiction, power, and procedure of that commission. One of those general provisions (section 22) states that, after an order has been made by the commission, any person interested shall have the right to apply for a rehearing "in respect to any matter determined therein."

This section further provides: "If, after such rehearing and a consideration of the facts, including those arising since the making of the order, the commission shall be of the opinion that the original order or any part thereof is in any respect unjust or unwarranted, or should be changed, the commission may abrogate or change the same." After these "general provisions," the statute contains specific provisions relating to the various classes of corporations committed to the jurisdiction of the commission, and among others "provisions relating to gas  *  *  and electrical corporations; regulation of price of gas and electricity." By section 65 it was provided that all charges made by any gas corporation for gas shall be reasonable and not more than allowed by law or by order of the commission. By section 66 it is provided that "the commission shall  *  *  *  have power by order to fix and change from time to time standards of the purity, illuminating power and heating power, and standards for the measurement thereof, of gas to be manufactured, distributed or sold." By section 72 the commission was empowered to fix just and reasonable prices, rates and charges for gas. Then follows the provision that, "the price fixed by the commission under this

section  *  *  *  shall be the maximum price to be charged  *  *  *  for gas  *  *  *  within the territory and for a period to be fixed · by the commission in the order, not exceeding three years except," etc.

Acting under authority of these sections, two orders were made by the Public Service Commission on the 30th day of August, 1922—one fixing the price to take effect October 1, 1922, and to "continue in force until September 30, 1923, and thereafter until the commission shall otherwise order," and the other establishing the standard to take effect October 1, 1922, and to "continue in effect until changed, modified or abrogated by this commission." Plaintiff's Exhibit 80.

In the month of May, 1923, and while these orders were in full force and effect, the Legislature passed the statute in question (Laws 1923, c. 899), amending the Public Service Commission Law, by adding a section to be known as 67-a, whereby the plaintiff was forbidden to charge or receive more than $1 per thousand cubic feet of gas furnished to its consumers and was further forbidden to furnish to its consumers gas of a standard less than 650 B. t. u. per cubic foot. The statute had conferred no authority upon the commission to establish a standard of purity "for a period to be fixed by the commission in the order, not exceeding three years," etc. The power in this regard was expressly limited to the fixation of a price, although, as above stated, the statute in another section conferred upon the commission power to regulate the standard of purity by appropriate order from time to time.

The commission therefore appears to have been empowered by the Legislature to make orders establishing a maximum price during a period not exceeding three years and other orders fixing a standard of purity from time to time; both classes of orders, however, to remain subject to abrogation or change upon a rehearing. The situation created by the order fixing the price for one year has been aptly described as a "period of repose" (Village of Saratoga Springs v. Saratoga Gas, etc., Co., 191 N. Y. 123, 83 N. E. 693, 18 L. R. A. [N. S.] 713), subject to disturbance by the Legislature or by the commission. The late chief Judge Cullen seems to have so viewed the status thus created. A predecessor statute was under consideration, held unconstitutional on other grounds, but containing this identical provision. The court there said, "We have no difficulty in upholding the provision that the rate shall

remain as established for the term of three years," but this statement is qualified by the further statement that it was doubtless true that, "if the Legislature had itself fixed rates, * * * the rates would be permanent until the statute enacting them had been modified or repealed." The fact that the "period of repose" was prescribed by an agent of the state thereunto duly authorized, in no wise differentiates the situation from one where such a "period of repose" might have been prescribed directly through legislative enactment.

By competent evidence, the plaintiff established that, when this "period of repose" was ordered by the commission, substantial sums of money were expended in reliance upon its continuance, whereby appliances were adjusted to the new requisition of the commission. The learned counsel for the plaintiff urged the argument that the state has thus become estopped from prescribing a new standard before the expiration of the allotted period. It would seem a sufficient answer to point to the power of repeal vested in the Legislature and to the power of abrogation or change reserved to the commission. A further and more fundamental answer, however, is found in Boston Beer Co. v. Massachusetts, 97 U. S. 25, 24 L. Ed. 989. Legislation may have the practical effect of rendering a given investment valueless, but no contract is thereby impaired.

"A common carrier cannot by making contracts for future transportation or by mortgaging its property or pledging its income prevent or postpone the exertion by the state of the power to regulate the carrier's rates and practices. Nor does the contract clause of the Constitution interpose any obstacle to the exertion of that power." Producers' Transportation Co. v. Railroad Commissioners, 251 U. S. 228, 40 S. Ct. 131, 64 L. Ed. 239.

We may note in passing that the expense referred to by the plaintiff was occasioned by the change of standard, as to which no "period of repose" had ever been prescribed or authorized. Such a grant of power from the states to its commission, being in derogation of sovereign rights, must be subjected to strict construction.

Nor have I been impressed with the argument that "acceptance" of the order of the Public Service Commission operated in some sense to consummate a contract with the state. "Acceptance" of an order of the commission is provided for by section 23 of the statute, but seems nothing more than a re-quirement that the utility affected by an order of the commission shall, within the prescribed time, indicate whether or not it will contest the order in the courts. A declaration that the order is accepted cannot give to that order any greater binding force upon the state than the order itself inherently possesses, whether accepted or protested.

If there be a contract, it must be found within the four corners of this order and this acceptance. The order of the commission dated August 30, 1922 (Plaintiff's Exhibit No. 68), after prescribing the rates, states "that this order shall take effect October 1, 1922, and shall continue in force until September 30, 1923, and thereafter until the commission shall otherwise order."

But this provision is qualified by the succeeding paragraph, namely: "Further ordered that this order shall be without prejudice to the right of any interested party to apply to the commission for a continuance of the hearings in these proceedings for the purpose of presenting the evidence relating to the subject-matter of this order."

When plaintiff "accepted" this order (Plaintiff's Exhibit No. 79), that acceptance was qualified. The plaintiff notified the commission "that the said order of August 30, 1922, and the terms and conditions thereof are accepted and will be obeyed," but then proceeded to say that "this acceptance and statement of readiness to obey the said order dated August 30, 1922, is not intended as a concession by the Brooklyn Union Gas Company that the rates therein prescribed are adequate or reasonable or that such rates and classifications of service will yield a proper return upon the value of the property, used and useful, in its business. Such acceptance and statement of readiness to obey is not intended as a waiver of any right at any time in the future to claim a return upon the value of its property at the time or any other right which it may have with reference to the rates, past, present, or future."

Thus the commission made its order, reserving the right given it by statute to alter, modify, or abrogate the same, and the plaintiff accepted the order without waiving its right to challenge the validity thereof. I cannot read into this order and this acceptance such a meeting of the minds by way of mutual convenant between the state and the utility as would even purport to constitute a contract. Each side reserved the right to recede from the provisions of the order.

These views have led to the conclusion

that the statute in question does not violate section 10 of article 1 of the Constitution.

I have studied the opinion of the United States District Court for the Southern District of New York in New York & Queens Gas Co. v. Prendergast et al. 1 F.(2d) 351. Judge Winslow there reaches a different conclusion. The special master indulges the hope, however, that in the expression of these views for the guidance of the court he may not seem guilty of impropriety, much less of judicial insubordination.

With the greatest deference to that learned court, may I be permitted to add that the authority there cited (Mobile Gas Co. v. Paterson [D. C.] 293 F. 208) seems capable of being distinguished from the case at bar. In the instant case we confront the task of ascertaining to what extent, if at all, the state may contract away the exercise of its inherent police power. In the cited authority the state had devised a method by which an issuable allegation of fact (namely, the value of property upon a given day) might be established by contract—by appraisal—by choosing arbiters, in order that the state might thereafter freely exercise these same police powers. That which was there sustained would not, in theory or substance, be different from a stipulation in the instant case, whereby the litigants fixed a valuation of plaintiff's property as of the 1st day of June, 1923, and consented to an adjudication based thereon. In that case the state had extended an invitation to public utilities to permanently resolve such an issue by adopting a prescribed course of procedure, and had nominated the consideration which the utility must pay as a condition of acceptance. It was held that, when the utility had accepted the offer of the state and had paid the consideration, and a valuation had been determined, thereupon a contract had been consummated which the state had no power to impair. The contract there sustained, however, was not a contract establishing a rate, but rather a contract establishing the valuation of certain property upon a certain date for future rate-making purposes.

It was in these circumstances that the present litigation was instituted. The plaintiff has made no attempt to comply with the statute. Immediately all operations thereunder were suspended by an injunction issued out of this court upon motion of the plaintiff. The defendants urge that the plaintiff should not be heard with reference to the alleged confiscatory nature of this statute until by actual operation thereunder it shall be made possible to demonstrate the facts and figures upon which such a contention must rest. In support of this view reliance is placed upon the decision of the Supreme Court (Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), where the constitutionality of chapter 125 of the Laws of 1906, known as the 80-Cent Gas Law, was similarly challenged. The court denied the relief sought without prejudice to the institution of a new action should the result of experience indicate necessity therefor. In so doing, however, the court said:

"Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory nature, and in that event there should be no hesitation in so deciding and enjoining its enforcement without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate."

The plaintiff has undertaken to bring itself within that phase of the rule. At the time the statute in question became operative, June 2, 1923, plaintiff was providing gas of 580 B. t. u., which had been the average thermal content of its gas since May 15, 1923, as tested at the works. Evidence has been produced to establish the actual cost of furnishing that gas, and it is plaintiff's contention that the price prescribed by this statute, $1 per thousand cubic feet, would yield an insufficient return for even that standard of gas. Evidence has been submitted to establish the additional cost which would be involved in furnishing gas of 650 B. t. u. Plaintiff thus contends that the alleged confiscatory nature of this statute may be considered as a result of experience. Fully recognizing the reluctance of courts to declare a statute of this character confiscatory until experimentation has first been had (Municipal Gas Co. v. Public Service Commission, 225 N. Y. 89, 121 N. E. 772; Kings County Lighting Co. v. Nixon et al. [D. C.] 268 F. 143), yet the Supreme Court, in the language which is quoted from Willcox v. Consolidated Gas Co., recognizes that an exceptional situation may possibly exist. I think the plaintiff has brought itself within the rule.

This is not the sole contention, however, upon which the plaintiff rests its right to be heard without passing through a "test period." By appropriate evidence plaintiff has shown that the appliances utilized by its consumers at the time the statute in ques-

tion was enacted had been adjusted to conform to the requirements of the order issued by the Public Service Commission on the 30th day of August, 1922, which, by its terms, went into effect October 1, 1922. Between the date of the order, August 30th, and the date when it became effective, October 1st, plaintiff made the adjustments in question. It is made clear by the evidence that the proposed standard prescribed by the act in question would require a readjustment of these same appliances, utilized by the consumers, that such a readjustment, even with the greatest diligence, could not be effected at once, and that to supply consumers with gas of 650 B. t. u., without first readjusting the appliances of the consumers to utilize the same, would endanger the health, if not the life, of the community, through the escape of a noxious product of combustion, carbon monoxide, an odorless but deadly gas. Counsel for plaintiff therefore urges that this state of facts alone (uncontradicted) renders a test period, in itself, a menace to the community. The construction of this statute has been very sharply litigated. Inasmuch, however, as the plaintiff has brought itself within the rule laid down by the Supreme Court, as previously stated, we may pass to a consideration of the evidence tending to establish the alleged confiscatory feature of the statute and revert to the question of statutory construction in the light of the conclusions reached upon that issue.

For the purposes of this action I deem it the province of the court to ascertain the "fair value" of the property used and useful by the plaintiff in serving the public. It has been my aim to be governed by the doctrine enunciated by the United States Supreme Court in Smyth v. Ames, 169 U. S. 546, 18 S. Ct. 418, 42 L. Ed. 819, as that doctrine has been amplified and applied in later cases. We have been admonished through these adjudications that the company is entitled to a fair return upon the fair value of the property at the time it is being used for the public; that the determination arrived at must be a reasonable judgment, having its basis in a proper consideration of all relevant facts; that it would be erroneous to adopt a valuation based upon replacement costs less depreciation to the exclusion of other relevant facts; that there is no rule requiring slavish adherence to cost of reproduction less depreciation; that appropriate weight is to be given to any enhanced cost of material, labor, supplies, etc., over those prevailing at the time of acqui-

sition or construction; and that the rule in Smyth v. Ames, as interpreted and employed means merely that all must be considered, no one element to the exclusion of all others. Minnesota Rate Cases, 230 U. S. 434, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; San Diego Land & Town Co. v. National City, 174 U. S. 757, 19 S. Ct. 804, 43 L. Ed. 1154; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Waterworks Improvement Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Georgia Railway & Power Co. v. Railroad Commission of Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 44 S. Ct. 471, 68 L. Ed. 934.

In the light of these decisions, I have sought to ascertain the original cost of construction, the amount expended in permanent improvements, the amount in market value of outstanding bonds and stock, the present cost of construction, the probable earning capacity of the property under the rates prescribed by the statute under consideration, and the sum required to meet operating expenses, together with such relevant facts as might be available.

In this connection it has been my purpose to bear in mind that, while value is, after all, a matter of opinion, yet opinion evidence is not binding upon the court, and does not require the court to surrender its own judgment, thereby substituting the opinion of a witness for that of the court. The Conqueror, 166 U. S. 110, 131–133, 117 S. Ct. 510, 41 L. Ed. 937; Head v. Hargrave, 105 U. S. 45, 49, 26 L. Ed. 1028.

Within such a rule the following facts seem reasonably well established:

When the plaintiff acquired the properties of these seven vendor corporations, November 4, 1895, the purchase price was paid by issuing the bonds of the plaintiff to the face value of $10,600,000, and by issuing its capital stock to the par value of $15,000,000, thus indicating a purchase price measured in the par or face value of the securities in the aggregate of $25,600,000. Certain of these properties were taken subject to subsisting mortgages, the payment of which was assumed by the plaintiff in addition to the issue of these securities. An effort was made

to prove the cost of this property to the vendor corporations. Many difficulties, however, were encountered. It appeared that no inventory existed showing what properties as matter of fact were then acquired by the plaintiff. Many ancient records and books of account of the vendor corporations were found, such as minute books, ledgers, journals, etc., but no complete record, however, as to any one of the vendor companies. One of the plaintiff's witnesses, a certified public accountant, testified that he had carefully examined all of these books and found the records so incomplete that it was impossible to ascertain the amount which the vendors had paid for the properties apparently owned by them and presumably turned over to the plaintiff in November, 1895. These books were made available to the defendants who, in turn, caused the same to be examined by certified public accountants of their own choosing. The result was substantially the same, although additional information concerning the cost of certain specific items was thereby developed. No attempt was made, however, by either side to fabricate from these incomplete records the cost to the vendors of the properties which it is assumed were acquired by the plaintiff.

A further difficulty was encountered in an effort to show what properties owned by the plaintiff on the 1st day of June, 1923, had been acquired on November 4, 1895. The Attorney General called a number of employees of the plaintiff who had been in the employ of the vendor corporations prior to November 4, 1895, and who had remained in the employ of the plaintiff thereafter and up to the present time. By this means a general picture of certain of the plants on November 4, 1895, was drawn from the memory of these witnesses, but the effort to trace the cost of the properties proved abortive in the main, and was limited to certain specific items. Taking the evidence on this subject as a whole, and without stopping to make an extended analysis, I deem it sufficient to say that an industrious effort was made by plaintiff to establish the original cost of the vendors, which proved unsuccessful, and the defendants supplemented this effort with no greater success. I therefore conclude that it is incapable of proof.

An examination of these books, however, disclosed certain facts, even though the objective was not attained. When these transactions were consummated November 4, 1895, the books of the vendor corporations, with at least one exception, had not been technically closed, but presented ledger balances as of November 4, 1895; on that day, the plaintiff recorded these transactions by way of opening journal entries on its own books of account. We thus have the ledger balances shown on the books of the vendor corporations and the treatment adopted by the vendee with reference to the same subject-matter at the same date. The ledger balances upon the books of the vendor corporations indicated that the assets acquired by the plaintiff were carried at an aggregate valuation of $16,524,095.35. This included, however, an item for "Franchises and Rights," carried by one of the vendor corporations, namely, the Citizens' Gas Company of Brooklyn, amounting to $1,250,000. Deducting this item, it appears that the physical assets conveyed to the plaintiff were carried by the vendor corporations at an aggregate valuation of $15,274,095.35. Plaintiff's Exhibit 297.

The original journal entries formulated by the plaintiff, recording the acquisition of these same properties, indicated an aggregate valuation of $28,799,731.92. Plaintiff's Exhibit 297. In this item, however, was included a valuation of intangible assets "franchises and rights" to the amount of $3,050,000. No such items had appeared upon the books of the vendor corporations except the item of $1,250,000, above referred to. If we disregard these items, it would appear that in its opening journal entries the plaintiff gave to the physical property so acquired an aggregate valuation of $25,749,731.93.

The effort to establish actual cost of vendors having thus proved futile, the plaintiff produced opinion evidence, first as to what these properties should have cost the vendor corporations, and, secondly the reproducible value of the same at the time they were acquired, November 4, 1895. Plaintiff's expert testified that he had considered such items of cost as could be gleaned from the incomplete books of the vendor corporations, and that he had given due consideration to the same, and that he had ascertained the general trend of prices during the period covered by the corporate life of the vendors, approximately from the year 1850 down to the date of the conveyance, 1895, and, although, unable to ascertain the respective dates of actual construction of these various properties, had adopted index values throughout the period which enabled him to express the opinion that properties referred to in a hypothetical question by way of capacity and general description, in the absence of an inventory, should have cost $23,976,790. The witness further stated that, in expressing this opin-

ion, he had excluded land, franchises, working capital and going concern value. The land acquired by the plaintiffs had been carried by the vendors at a valuation of $2,619,226, and was set up on the books of the plaintiff in its opening journal entries at a valuation of $5,349,400. This same witness testified that in his opinion the reproducible value of these properties in November, 1895, was $17,996,216, excluding, of course, land, franchises, working capital, and going concern value.

It was further shown that at the time this transaction was consummated the vendor corporations had outstanding capital stock aggregating in par value $9,970,000, together with bonds of the aggregate face value of $3,900,000, making the total par or face value of outstanding securities $13,870,000, and that the market value of these securities, as established by appropriate records, aggregated $20,000,000 at that time. Defendants' Exhibit 181.

Summarizing, therefore, all of the evidence which is designed to illuminate the question either of "Historical Cost" or of "Book Value" of the physical properties acquired by the plaintiff November, 1895, at the time of such acquisition, we have the following:

(8) Valuation by the vendor corporations as expressed upon their books by way of ledger balances November 4, 1895.................$15,274,095.35

(b) The valuation placed upon all properties by the plaintiff itself in its opening journal entries aggregated $28,799,731.92. If we deduct the valuation placed by the plaintiff upon the intangible assets then acquired, namely, $3,050,000, it would appear that the plaintiff's own valuation of the physical assets at that time was........... 25,749,731.93

(c) The purchase price of the physical assets is indicated as follows: The gross purchase price consisted of securities issued at a par or face value aggregating $25,600,000, together with the assumption of existing mortgages, aggregating $3,900,000, or a total of $29,500,000. "Franchises and rights" were carried at $3,050,000. We may perhaps be justified in the inference that the plaintiff was of the opinion that it had paid for the physical assets, the difference, namely .................... 26,450,000.00

(d) Again, plaintiff's valuation of these assets allocated about 88 per cent. to physical property and about 12 per cent. to intangible items. It may perhaps be inferred that they deemed the purchase price capable of the same allocation, which would give to the physical properties a valuation of about .......... 25,960,000.00

(e) Opinion evidence of the plaintiff's expert asserted that these physical properties should have cost the vendor corporations $23,976,790, to which should be added plaintiff's valuation of the land acquired ($5,349,500) ............ 29,326,190.00

(f) Opinion evidence of plaintiff's expert asserted that the reproducible value of the physical properties in November, 1895, was $17,996,216, to which again must be added the land valuation ($5,349,400)... 23,345,616.00

(g) The face or par value of securities of the vendor corporations, issued and outstanding at the time of the transaction, was...... 13,870,000.00

(h) The market value of those same securities at that time was............... 20,000,000.00

The difficulty of establishing reliable data as a starting point thus becomes manifest. This difficulty is accentuated by the fact that the vendor corporations from time to time charged to profit and loss various capital items aggregating about $2,000,000, and there seems no data available from which to determine whether or not any tangible property referred to or reflected in these entries was actually acquired by the plaintiff, even though thus charged off. On the 1st day of January, 1909 a uniform system of accounts was promulgated by the Public Service Commission of the state of New York, from which date either "Historical Cost" or "Book Cost" may be more readily traced. Withdrawals of items charged to fixed capital between November 4, 1895, and December 31, 1908 (that is prior to the installation of the uniform system of accounts), were fixed by stipulation between counsel at $4,000,000. In the meantime, however, the plaintiff had purchased the properties of the Equity Gas Works and paid therefor $568,066. The plaintiff had also acquired the entire capital stock of five subsidiary corporations, namely, Jamaica Gaslight Company, Richmond Hill & Queens County Gaslight Company, the Woodhaven Gaslight Company, the Newtown

Gaslight Company, and the Flatbush Gas Company. These subsidiary corporations maintain a separate corporate existence but manufacture no gas. They purchase from the plaintiff the gas distributed to their consumers, and certain properties owned by the plaintiff are used by these subsidiaries, but, as already stated, there is no available data by which the actual cost of such properties can be ascertained. As a result of calculations from the exhibits in evidence, however, it is estimated that the property so allocated to the subsidiaries should have cost the vendors $5,123,146. Utilizing this estimate, the effort to establish the book cost of the properties of the plaintiff used and useful in its gas business on the 1st day of June, 1923, would lead us into the following analysis and calculation:

The opening journal entries on November 4, 1895, indicate a valuation of physical assets. ..$25,749,731.93.
It appeared in evidence that on the 1st day of June, 1923, the books of the plaintiff showed an aggregate net fixed capital of $49,199,133.93. If we take from this the opening journal entry of November 4, 1895, $28,799,-731.92, the difference would represent the net additions to capital subsequent to November 4, 1895, as shown by the books of the plaintiff, namely....... 20,399,402.01
To this should be added the amount paid by plaintiff to acquire the Equity Gas Works (Defendants' Exhibit 46) .... 568,066.00

Total ...................$46,717,199.94
From this should be deducted an item representing the withdrawals from capital between November 4, 1895, and December 31, 1908, fixed by stipulation at $4,000,000, as well as an estimate of the cost of properties used by the subsidiaries, say 10 per cent. of the remainder ($42,717,199.94), namely, $4,200,000 ..................$ 8,200,000.00

This analysis of the books of the plaintiff corporation would indicate (though not establish) that the net cost of physical properties, including the Equity Gas Works and excluding property utilized by the subsidiaries, as of June 1, 1923, was $38,517,199.94

The capitalization of the plaintiff on the 1st day of June, 1923, as represented in outstanding stocks at par and bonds at face value aggregated $46,579,000. Plaintiff's Exhibit 78. The market value of these securities on that day was $48,750,000. The fixed

capital of the plaintiff on that day, as the same appeared upon their books of account, excluding any value for franchises and rights, aggregated $46,149,133.93.

A fair picture of plaintiff's activities may be gained by noting that on June 1, 1923, it owned and operated 6 manufacturing plants having an aggregate daily capacity of nearly 125,000,000 cubic feet of gas; it owned 26 commercial holders, with pumping stations having a total storage capacity of over 30,-000,000 cubic feet, exclusive of relief holders; and it shared with its subsidiaries the use of other holders and stations owned by the latter having an additional aggregate capacity of approximately 26,000,000 cubic feet; it maintained various branch offices throughout the borough of Brooklyn, as well as storage yards and garages, at convenient places; it owned and used 25 parcels of real estate, and rented for its use several other parcels; it had nearly 500,000 meters in service and about 8,000 in stock; it had over 1,000 miles of mains in use and nearly 150,-000 services; and its maximum day's sendout during the winter of 1923 and 1924 was nearly 95,000,000 cubic feet.

Upon the cost of reproduction of these properties as of June 1, 1923, a vast amount of specific evidence was introduced by the plaintiff with reference to each class of property. The testimony of witnesses was largely supplemented by exhaustive schedules and tabulations prepared for the purpose of showing how the witnesses arrived at their respective opinions, and quite fully analyzing the methods of calculation employed. All such schedules will be found among the exhibits in evidence. A copy of each such exhibit was supplied to counsel for the defendants sufficiently in advance to afford opportunity for analysis with the aid of their own experts prior to cross-examination. The books of record and account of the plaintiff were likewise rendered available to the defendants and their experts. It appears here and there in the record that the defendants availed themselves of this permission, and that many such books and records were as matter of fact examined by or on behalf of the defendants during the progress of the trial. I know of no instance where a request by the defendants in this regard was not granted by the plaintiff. In at least one instance of major importance it appears in evidence that expert engineers employed by the defendants were actually in conference with expert engineers employed by the plaintiff concerning a voluminous exhibit which

plaintiff's expert had prepared and which was introduced in evidence. The defendants Public Service Commissioners possessèd such familiarity with these books and records (the exhibits being largely compilations therefrom) as would naturally flow from the exercise of their visitorial powers and from the possession of reports filed with the commission by the plaintiff at stated intervals as required by law and by the rules of the commission. It seems justifiable to charge these defendants with that degree of knowledge of the contents of these books and records of the plaintiff as would enable them to challenge any erroneous data introduced in evidence by the plaintiff. In the main, however, plaintiff's evidence on reproduction cost was not contradicted. All of the witnesses were exhaustively cross-examined by counsel for the defendants, and throughout the cross-examination these schedules and tabulations were exhaustively analyzed. No glaring inaccuracies were developed, and the record contains no imputation of an attempt to mislead the court nor any suggestion that plaintiff's witnesses were unworthy of belief, or that their testimony represented anything other than their conscientious opinion with reference to the subject-matter of this inquiry.

Much of this evidence was highly technical, and the opinions were based upon a technical knowledge of the subject-matter. Facilities were at the disposal of the defendants by utilizing the staff of trained experts, accountants, and engineers maintained by the Public Service Commission at public expense, and peculiarly available in such an action as this, where the interests of the community are to be safeguarded. Recognizing the untiring zeal and unusual skill of counsel throughout the trial, the unmistakable evidence of careful study easily discerned in the conduct of cross-examination, I am constrained to regard the absence of expert testimony traversing that of the plaintiff as justification to the court in relying upon plaintiff's evidence and regarding the same as trustworthy. This is peculiarly true, in view of the fact that an expert for the defendants had prepared a voluminous exhibit, and the same was introduced in the evidence but subsequently withdrawn by defendants' counsel, and no substitute therefor was presented for consideration. It is a fair inference that plaintiff's evidence cannot be successfully challenged except as to such matters as were developed in the cross-examination.

The effect of such variations as appeared upon cross-examination can scarcely be measured, except by one equally qualified as the expert under cross-examination. No attempt, however, was made by the defendants to fabricate these contra considerations into an opposing expert opinion. For example, stress is laid by the defendants' counsel upon the testimony of one of plaintiff's experts that his conclusions were based upon excavations made by hand. Upon cross-examination it was made to appear that he was perfectly familiar with the steam shovel and other mechanisms of that type; yet it does not appear by any evidence adduced by the defendants that these should have been used and that economy would have resulted. Again, the market price of cast iron pipe was shown to be variable, and the unit cost of labor adopted by plaintiff's witness was challenged in cross-examination, upon the ground that the unit thus adopted was higher than the unit derived from the existing pay roll of the plaintiff at that time, June 1, 1923. On the other hand, when plaintiff had rested, defendants offered no evidence to the effect that some other unit for the market price for cast iron pipe should be adopted; and, as to the unit cost of labor, it appeared that permanent employment was a factor to be taken into consideration, as well as the variations of the labor market, although it was urged that, inasmuch as the proposed construction would consume approximately two years, this should be deemed substantially permanent employment.

Examples might be multiplied. The court has not the benefit of any opinion expressed by experts called by the defendants. With the record in this condition, I have been greatly aided by exhaustive and voluminous briefs submitted on behalf of the defendants. Nevertheless, the arguments of counsel, however cogent, are not a substitute for evidence. For these reasons I have deemed it essential to give unusual attention to the evidence of the plaintiff's witnesses, and to scan that evidence in the light of all that was elicited upon cross-examination. There are features here and there which have led me to regard some estimates as somewhat higher than the evidence taken as a whole warrants. These features will be reflected in the findings and in the comments upon the various classes of property about to be taken up. This work of the special master has been pervaded by a consciousness of the danger that inadvertently, without the assistance of expert evidence challenging that of the plain-

tiff, the superficial education of the layman with reference to these highly technical matters might lead him to arrive at a conclusion not warranted by the evidence, thereby substituting a personal opinion for the probative force of testimony. On the other hand, the danger of adopting the plaintiff's evidence substantially in toto as a basis for findings is manifest. As between these two dangers I have given somewhat greater consideration to the record than might have been essential had the aid of defendants' experts been made available, and I have arrived at the following conclusions:

## Land.

The land is specifically described in appropriate exhibits. For the purpose of establishing its value on the 1st day of June, 1923, plaintiff submitted the opinion of experts. Aside from cross-examination, the defendants made no attempt to challenge the evidence of these experts beyond the introduction in evidence of the assessed valuation of the land for purposes of municipal taxation made in October, 1922, that is eight months prior to the date to which the controversy in question is addressed. While there are sporadic cases in which assessed valuations for taxation purposes have been received as evidence of market value, the general rule seems to be contra. Manifestly, the assessors themselves might have been called, and, if shown qualified, would have been permitted to express an opinion, subjecting themselves to cross-examination in that regard. In the instant case counsel stipulated as to what these assessed valuations were for the year 1923, and the plaintiff made no objection "to this method of proving them upon any ground of competency." The plaintiff, however, objected to the introduction of these valuations made in October, 1922, as immaterial and irrelevant. The objection seems to be limited to the proposition that an assessed valuation made in October, 1922, was immaterial and irrelevant to establish the value on June 1, 1923.

The record in its present form proves no more than would have been established had "the amount of the assessed valuations" been shown by producing the assessment rolls. These assessed valuations would not have been received in evidence had it not been for the stipulation, as opportunity to cross-examine the assessors themselves was denied the plaintiff, and there is no evidence qualifying these assessors as experts. Assuming that the assessors themselves had been called

and had been shown duly qualified to express an opinion, I am inclined to think that the difference in date is not so remote as to render the evidence immaterial and irrelevant, particularly in the absence of any evidence tending to show any change in market values between October, 1922, and June, 1923. Accordingly I have considered these assessed valuations of October, 1922, as perhaps some evidence of the value of this land on June 1, 1923. There is a great disparity between these assessed valuations, which aggregate $2,769,800, and the valuations of plaintiff's experts, which aggregate $3,451,600, a difference of $681,800.

Turning to the cross-examination of plaintiff's expert, we find some instances where the witness seems to have had a more limited amount of data upon which to base an opinion than in many other instances. It is noticeable that these assessed valuations, with negligible exceptions, are uniformly lower than the opinions expressed by plaintiff's experts. It may be argued that, having in mind the duty charged upon these assessors by the statute, there is a presumption that they performed their duty; yet we know that many factors as, for example, equalization, enter in arriving at these determinations. Upon mature consideration of the entire record, I have arrived at the conclusion that the value of this land on June 1, 1923, should be placed at not to exceed $3,000,000.

## Buildings and Structures other than Manufacturing Plants and Stations.

The evidence on this subject is somewhat perplexing. Mr. Burt, an expert called by the plaintiff expressed the opinion that the reproduction cost amounted to $7,149,685. He distinguished buildings at the works, where he placed the reproduction cost at $4,354,549, from buildings outside of the works, where this reproduction cost was placed at $2,795,136. Plaintiff's Exhibit 171. Mr. Burt further testified that it would require an expenditure of $20,756 to restore these buildings to a condition equal to new. Plaintiff's Exhibit 172. The expenditure thus stated to be required seems negligible, but the defendants have introduced no evidence to the contrary. Upon cross-examination, there was a suggestion in the form of questions propounded to the witness to the effect that, while Mr. Burt's valuation was as of June 1, 1923, the plaintiff had, as matter of fact, between June 1 and December 31, 1923, spent approximately $7,000 in repairs upon

the buildings 1116 and 1124 Fulton street, and substantially a like amount upon repairs to the building 176 Remsen street, although the witness had testified that the latter building required an expenditure of only $380. Plaintiff's Exhibit 172. Whether or not such expenditures as were thus suggested by the questions were as matter of fact incurred by the plaintiff, does not specifically appear, except from an examination of plaintiff's books of account in evidence. These books do not sustain the suggestion embodied in the questions, although they indicate that repairs were made subsequent to June 1, 1923. Mr. Burt testified that at the time of his examination some repairs were in process of installation, and I interpret the testimony of Mr. Burt as substantially to the effect that in making his valuations and estimates he deemed the repairs then in progress as having been carried to completion. Pursuant to the stipulation of counsel, the assessed valuation of certain of these properties, adopted for purposes of taxation in October, 1922, was introduced in evidence. Counsel for defendants drew especial attention to nine properties, where the aggregate cost of reproduction was said by plaintiff's witness to amount to $1,740,923.34, while the aggregate assessed valuation of the same buildings was only $660,200, namely:

| | Burt's Estimate of Cost of Reproduction New. | Assessed Valuation (Deft's Ex. 187). |
|---|---|---|
| General office building, 176 Remsen street.. | $1,026,099.28 | $447,000 |
| Demonstration building, 180 Remsen street ............ | 135,337.21 | 22,000 |
| Warehouse, 130 Atlantic avenue......... | 56,345.01 | 7,400 |
| Warehouse garage, 1016 Fulton street.. | 30,131.67 | 14,000 |
| Nassau branch, 1024 Fulton street ...... | 219,419.73 | 83,500 |
| Metropolitan branch, Fifth avenue and Eighth street ...... | 73,576.38 | 24,500 |
| Williamsburg branch, 322 Bedford avenue | 117,529.92 | 40,500 |
| Fitters' school, 197 St. James place ....... | 34,210.24 | 8,650 |
| Laboratory and medical school, 191 St. James place ...... | 48,273.90 | 12,650 |
| Total ........... | $1,740,925.34 | $660,200 |

Here is a disparity almost three to one. The cross-examination of Mr. Burt did not result in any serious modification of his testimony, and the defendants have introduced

no evidence challenging or traversing the opinion and calculations of this witness. The assessed valuation must be regarded as "an estimate of the sum for which, under ordinary circumstances, the same parcel of real estate would sell with and without improvements," such being the duty of the assessors. Greater New York Charter (Laws 1901, c. 466) § 889. Mr. Greve frequently utilized assessed valuations of buildings for the purpose of arriving at an opinion concerning the value of land. In some instances he testified that, having formed an opinion concerning the value of the land and buildings taken as a unit, he deducted the assessed valuation of the buildings and thus arrived at his opinion concerning the value of the land. This ties into the testimony of Mr. Greve the assessed valuations of the land with and without the buildings in a somewhat perplexing fashion, and perhaps gives to these assessed valuations for the present purpose a somewhat different status than in the case of land values only. Nevertheless, they do not operate very forcefully, if at all, by way of a challenge to the testimony of Mr. Burt as to the cost of reproduction new.

The defendants have directed attention to the doctrine enunciated in People ex rel. New York Dock Co. v. Cantor, 208 App. Div. 52, 203 N. Y. S. 424, where an assessment of water front property was under consideration. I have been urged to distinguish between buildings and structures peculiarly designed for gas-making purposes on the one hand and other buildings utilized by the plaintiff for offices, storage, demonstration, and so forth. It is claimed by the defendants that evidence of reproducible cost of the latter class of buildings should not be received until it had appeared in evidence that other suitable buildings were not available in the market, and that, if available, the evidence should have been limited to what it would cost to purchase a suitable substitute.

I have not followed the ruling in the New York Dock Company Case, mainly for the reason that the task confronting the court in that case was not identical with the task which we here confront. We are seeking to ascertain fair value, and to that end we are authorized to receive evidence of reproduction cost upon the day in question, not because reproduction cost is synonymous with fair value, but because that cost and other relevant features are deemed competent evidence to assists the court in ascertaining fair value. In the New York Dock Company Case the court was seeking to ascertain mar-

ket or exchange value, and because the building possessed individual characteristics to which other buildings were not comparable, destroying their market, evidence of reproduction cost was received as a means of ascertaining market or exchange value.

While in cross-examination the varying price of brick and other commodities was established, yet no attempt was made to show the effect of these varying market conditions of building material upon calculations of plaintiff's witnesses. Upon all the evidence, I fix this item at $7,000,000.

### Mains.

Plaintiff's witness, Mr. White, an expert, for many years in the employ of the plaintiff, having charge of the distribution system, including all installations, commanding a force of 600 to 800 men, testified that the cost of reproduction of mains of the plaintiff consisting of 1,017 miles as of June 1, 1923, would aggregate $19,073,209. Plaintiff's Exhibit 164. The same witness made an estimate in June, 1923, as of January 1, 1923, based upon 1,013 miles of mains, and at that time estimated the cost of reproduction as of January 1, 1923, at $16,206,084. It appeared in evidence that these mains occupied 905 miles of streets; the difference indicating the extent to which parallel mains have been laid in certain streets. The estimate as of January 1st differs from the estimate of June 1st, in that an item of overhead was omitted from the former and included in the latter, namely $1,162,663. It further appeared in the cross-examination of this witness that he had calculated the expense of installing each of these mains separately, making no calculations upon the theory that one excavation might be made large enough to carry all parallel mains wherever they might exist. Another witness subsequently called by the plaintiff calculated that a saving of $146,755 was possible by avoiding repeated excavations with the necessary backfill and surface finishing.

Cross-examination revealed that the unit price adopted for materials was subject to variation, and that, in the absence of an actual negotiation for the purchase of these vast quantities, there was room for more than one opinion as to the unit price which should be adopted. This was so also with reference to the labor unit. Quotations of prices from various sources were introduced in evidence by the defendants during the progress of cross-examination, but varying conditions were shown to exist which make it substantially impossible for one other than an expert equally well qualified to construct a new calculation based upon some other units. The defendants have not produced such evidence, and the court has not the benefit of the opinion of any other expert called upon to analyze the same problem by way of an attempt to traverse the method adopted and the conclusions arrived at by plaintiff's witness. Nevertheless, taking the testimony as a whole, it seems to me that the result of cross-examination warrants the conclusion that the unit prices of material and labor adopted by this witness were somewhat generous. If we take Mr. White's estimate as of January 1st, namely, $16,206,084, and deduct from it the extravagance which would have resulted from a separate excavation for each main where parallel mains were in a given street, namely, $146,755, there would remain $16,059,329.

The estimate made by this witness as of June 1, 1923, was $19,073,209. I deduct the allowance for economy in excavation, $146,755, making the net estimate $18,926,454, exclusive of charges for general engineering contractor's expenses and profit, administrative, legal, and miscellaneous general expenses during construction, interest during construction, and other undistributed structural costs. Plaintiff's Exhibit 164. While the cost of installations here and there actually made by the plaintiff on or about June 1, 1923, indicate a lower unit price, the evidence also shows that these installations were under different conditions, and would be improperly comparable with the larger problem, unless appropriate allowance be made for equalizing various features which differentiate the respective installations. There is no evidence in the case giving the court the benefit of such a comparison. The witness was confronted with other estimates made by himself—one for taxation purposes, as of December 31, 1922, and another as of October 1, 1919. I have given careful attention to the material thereby presented. I have arrived at the conclusion that the evidence upon this item fairly establishes that these mains could have been installed as of June 1, 1923, for at least $18,000,000. No allowance is here made for depreciation. The evidence was substantially to the effect that the life of these mains is unknown, and that whatever depreciation takes place is so slight that it is a negligible factor. For the guidance of the court, the plaintiff produced a piece of cast iron pipe which had been installed approximately 50 years ago. Experts

testified, upon examination of this exhibit, that it showed no substantial deterioration, and, for the purpose of a gas main, was as good as new. This evidence was not controverted.

### Services.

Plaintiff's witness Mr. White estimated the cost of reproducing the services in use at $6,256,506.65, exclusive of charges for general engineering contractors' expense and profit, administrative, legal, miscellaneous general expenses during construction, interest during construction and other undistributed structural cost. Plaintiff's Exhibit 165.

These services extend from the main in the highway to the curb, under the sidewalk to the building line of the consumer, and are extended upon the consumer's premises into the building. Mr. White's calculation was based upon an average length of 41 feet as to each service. Not all of the expense of installing these services has been borne by the plaintiff. A contribution has been made by some consumers in some cases. The status of these services and the extent to which they may be properly included within the cost of reproduction has been the subject-matter of extended discussion between counsel for the respective parties. At the close of the cross-examination, the evidence on this subject may be summarized somewhat as follows: Plaintiff's books of account, since January 1, 1909, when the uniform system of accounts was promulgated, record the expense of installing the entire service, and record also the contributions received by the plaintiff from consumers. When a service is replaced, the consumer makes no contribution to the cost of replacement. The pipe and all other materials constituting these services were purchased by the plaintiff in the open market, and the services were installed by the plaintiff at its own expense. These installations were at the request of the consumers. Some consumers paid a portion of the expense of the installations, and the custom was to charge the consumer from the house line to the meter. The practice in this regard seems not to have been uniform, but generally prevailed. There is no record showing the extent to which consumers actually contributed toward the expense of installing these services. There is no data identifying the particular consumers who may have made such a contribution and those consumers who did not. The proportion of the service pipe installed upon the land of the consumer varies, and there is no record by which this can be established.

I am of the opinion that, the material constituting these services having been the property of the plaintiff at the time of the installation, and having been installed by the plaintiff at its own expense, at the request of the consumer, title must be deemed to remain in the plaintiff until something to the contrary be shown. The mere fact that a consumer has contributed something toward the expense of the installation as a whole does not enable the court to arbitrarily allot title to some portion of the service in the plaintiff and some other portion in the consumer. It has been suggested that we invoke the familiar rule to the effect that such portion of these services as was installed upon consumer's premises became a part of the freehold in each instance. It seems, however, a fair inference from the evidence that this portion of the services remained personal property, owned by the plaintiff, installed upon the premises of the consumer at his invitation and by his license. The unit price adopted by plaintiff's witnesses was the subject of cross-examination, from which it appeared that the cost of installing services as recorded in the books of the plaintiff was substantially lower than the estimated cost of reproduction on June 1, 1923, that these services when withdrawn have been entered at cost, and that such units were noticeably lower than the estimated cost of reproduction. It appeared, however, that plaintiff's cost was modified by crediting the contribution of the consumer, and that the withdrawal cost was this net amount. The amount of the contribution by the consumer not having been shown, the basis of comparison is not available. The attention of the witness was called to an estimate made by him of the reproduction cost of these services as of October 1, 1919, and to another estimate as of December 31, 1922, made for taxation purposes, and to a still further estimate made by him as of January 1, 1923. Each of these estimates was differentiated from the estimate as of June 1, 1923; it being shown that items such as organization, insurance field supervision, disturbed pavement, storage of material, and so forth, were variously treated in these several estimates, but the cross-examination did not proceed far enough to develop just what treatment each of these items did as matter of fact receive in each one of the estimates. Thus again the material is not before the court from which a true comparison can be made.

The defendants offered no evidence traversing plaintiff's estimate and calculation.

Plaintiff made no allowance for depreciation of these services, although it appeared in cross-examination that obsolescence and electrolysis were factors. While it was shown that in 1912 49 services were taken up because they had corroded, it does not appear how long these had been in use, and the ratio seems small, for, while the exact number of services in the ground during that year was not shown, it does appear that there were 147,687 as of June 1, 1923. Plaintiff's Exhibit 165. Plaintiff's Exhibit 167, prepared by Mr. White, shows that services had been replaced, and it later appeared that many such services were replaced because the consumers required a larger pipe. If, then, the element of depreciation exists, it would seem to be negligible, particularly in view of the fact that the defendants have offered no evidence upon this subject. I fix this item at $6,250,000.

## Gas Meters.

Plaintiff proved that on June 1, 1923, it had 487,745 meters, and that the cost of the same new on that day would have been $4,550,162.05. Plaintiff's Exhibit 166.

This evidence was received after it had first appeared through the evidence of plaintiff's expert, Col. Miller, that there was substantially no depreciation in these meters, that they were substantially immortal as to their serviceability, and that a meter in use was more valuable than a new meter, while a repaired meter was equal in value to a new one. Upon cross-examination it developed that this opinion evidence was based upon the examination of 50 or 60 meters upon consumers' premises, and an examination of meters in the repair shop. This witness testified that, after an examination of the records of plaintiff corporation, he found nothing indicating the serviceable life of a meter. It appears in evidence, however, that 25,000 meters were, as matter of fact, scrapped by the plaintiff in 1922, and that more than 11,000 meters were scrapped between June 1 and December 31, 1923, that $335,515 were spent in repairing meters during 1923, and that $202,595.15 were expended for repairs to meters between June 1, 1923, and December 31, 1923. How many meters so repaired were comparatively new meters is not shown, nor have we any evidence indicating the average life of the meters thus repaired. Again, the evidence does not disclose why the discarded meters were scrapped.

Defendant caused an examination of plaintiff's records to be made for 11 years, 1913 to 1923, from which it appeared that during that period 56,870 meters had been retired; 19,000 of these were retired in the year 1923. Defendant's witness put in evidence a calculation based upon this examination of plaintiff's records, by which he arrived at the opinion that the meters retired during these 11 years had an average life of 24½ years. Defendants' Exhibit 186. While this evidence leads to the conclusion that depreciation is a factor to be considered in estimating the reproducible value of meters in use June, 1, 1923, yet it seems substantially impossible to deduce from this evidence a unit or rate of depreciation which may be safely adopted. The evidence seems not to establish such a unit. It is manifest from the evidence as a whole that at one time wet meters were used; that later on the wet meter was supplanted by the dry meter; that this process was gradual; that some of the meters in use today may be wet meters, but how many is not shown; that the dry meter has more longevity of service; that repairs do not arrest or modify this period of longevity. So far as the evidence before me is concerned, I have no way of determining what proportion of the discarded meters were wet meters, nor what proportion were absolutely and utterly destroyed, as by fire or by violence; nor again what proportion were discarded because a larger meter was needed. The evidence does disclose that these reasons exist, but the extent to which they affect this inquiry does not appear.

Another of plaintiff's witnesses, general superintendent of the American Meter Company, estimated the life of a meter to be from 25 to 33 years, although he later stated that, while general deterioration takes place, longevity is indefinite, and that 33 years is not the life of a meter. Again he testified that the oldest meter he had ever seen in use was 47 years of age. Upon all the evidence I fix this item at $4,000,000.

## Manufacturing Plant, Stations and Gas Holders.

Plaintiff's expert, Col. Miller, testified that the cost of reproducing these properties as of the 1st day of June, 1923, would aggregate $15,113,366 (Plaintiff's Exhibit 283), and further testified that, in order to restore these properties to a condition equal to new there would be required an expenditure of $528,368 (Plaintiff's Exhibit 284).

It appeared in cross-examination that some of these holders were constructed 50 years ago, and in some instances longer; that the former type of construction involved

brick tanks, while in the more modern type of construction steel tanks are used; that the older holders have a small capacity as compared with the holders constructed during the last 20 years; that the unit cost of construction adopted by Col. Miller was substantially higher than that incurred by the plaintiff in actual construction during the 20 years last past. The fact, however, that the prevailing cost of construction on June 1, 1923, was higher than the cost prevailing at the time these various holders were actually constructed by the plaintiff, is not disputed. While the amount said to be required to restore these properties to a condition equal to new may seem small, yet the evidence of Col. Miller is not met by any evidence on behalf of the defendants. Indeed I have been requested on behalf of the Attorney General to make a specific finding that this amount will be required to so restore the properties. Upon all the evidence, I fix this item at $14,500,000.

### Overhead.

Col. Miller has testified that something in excess of $17,000,000 is a proper allowance for the items, omission, and contingencies, engineering and general contractors' expenses and profits, administrative, legal, and miscellaneous general expenses during construction (estimated at about two years), interest and taxes during the same period, and organization and development prior to construction. His estimate was not met by any evidence on behalf of the defendants. I am referred to many decisions by public service commissions in various states where 15 per cent. and sometimes a little less has been allowed for overhead expenses in a reproduction cost estimate, and my attention is also called to the case of Monroe Gaslight & Fuel Co. v. Michigan Public Utility Commission (D. C.) 292 F. 149, where the estimate of the commission, 14 per cent., seems to have been adopted for the purpose of giving the commission the benefit of every doubt, although the utilities' engineers in that case had testified that 20 per cent. was a proper allowance. We should be required to allow at least 30 per cent. in order to justify the estimate of Col. Miller. The authorities diligently collated by counsel for both sides lead me to the conclusion that the allowance for overhead should be somewhere between 15 and 20 per cent. of the estimated reproduction cost, exclusive of meters. To this must be added an allowance for the cost of financing. Mr. Addinsell places this at a minimum of 5 per cent., and Col. Miller regarded the estimate as conservative. I allow for these items of overhead and financing $11,000,000.

### Equipment.

The book cost of equipment appears by the evidence to be $653,000. There was no evidence of reproduction value and very little with reference to depreciation. It is a fair assumption that under prevailing conditions, of which the court will take judicial notice, this equipment could not be reproduced for much less than its book value. I fix this item at $600,000.

### Summary of Reproduction Cost.

| | |
|---|---:|
| Land | $ 3,000,000 |
| Manufacturing plants, stations, and holders | 14,500,000 |
| Buildings and structures other than manufacturing plants and stations | 7,000,000 |
| Mains | 18,000,000 |
| Services | 6,250,000 |
| Meters | 4,000,000 |
| Overhead and financing | 11,000,000 |
| Equipment | 600,000 |
| Total | $64,350,000 |

From this must be excluded the property owned by the plaintiff but utilized by its subsidiaries, and in no sense dedicated to public use by the plaintiff. Based upon Defendants' Exhibit 46, there would be allocated to the subsidiaries $6,498,090, leaving $57,851,910 as my finding of reproduction cost as of June 1, 1923.

### Fair Value.

In determining the fair value of these physical properties, we may briefly recapitulate the data now available. While the original cost has not been established, the same may be estimated as closely approximating $39,000,000; the book value is about $46,000,000; outstanding securities represent a capitalization of about $46,500,000, having a market value of $48,750,000; the reproduction cost is $57,800,000.

Many of these properties are half a century old; some are more modern in type than others; all the properties are serviceable, and yet some of greater serviceability than others. On the other hand, all have been shown to be in excellent condition. Upon all the evidence, I have arrived at the conclusion that the fair value of these properties may safely be placed at $50,000,000, for the purposes of this action. I regard this as conservative. The finding as to reproduction cost was in itself designed to be conservative.

## Efficient Substitute.

Pervading the record may be discerned a consistent effort on behalf of counsel for the defendants to depart from the task of ascertaining "reproduction cost" of plaintiff's plant, and to establish the probable cost of that which the defendants or their experts may have deemed an efficient substitute therefor. Perhaps the most serviceable illustration of this effort will be found in the cross-examination of one of plaintiff's experts where an attempt was made to show that a new method of erecting gas holders had been devised and embodied in letters patent obtained in Germany. Defendants' counsel stated that the purpose of this line of inquiry was to show the progress made in the art of building gas holders and to determine whether or not, in any plan of reproduction, the witness would recommend the construction of holders embodying these patented devices in preference to the holders now in use by the plaintiff. I excluded this testimony. Subsequently, counsel for the defendants requested a reconsideration of this ruling, and, with the assistance of briefs submitted upon both sides, I gave further consideration to the matter, ultimately adhering to the ruling already made. In the final briefs, this question having been further treated by counsel for the defendants, I have been led to again consider the question involved, but I am unable to arrive at a different conclusion.

While the defendants offered no affirmative evidence to prove the cost of what they may have deemed to be an efficient substitute, it is probable that the rulings of the master, just cited, deterred them from so doing, anticipating that such evidence, if offered, would have been excluded. While the defendants have no specific exception in the record to the rejection of such evidence, I deem it only fair to say that they were justified in interpreting the attitude of the master as above stated. Primarily, as I read and understand the rule laid down in Smyth v. Ames, subsequently reiterated and amplified, it would have been a departure from that rule to admit the evidence.

My reluctance to admit this testimony was further based upon a realization that by so doing we should be led into a field of unlimited speculation, involving opinion evidence of one expert based upon the opinion evidence of another expert, embodying controversy upon academic questions which in the end could be of no substantial assistance in the effort to ascertain the "fair value" of that property which the plaintiff was devoting to the public service.

Had we entered upon this line of inquiry, it would have been necessary first to consider the scope and then the validity of the letters patent in question. This would have necessitated opinion evidence from a given line of experts. Then would follow a secondary field of opinion evidence concerning the availability of these patent rights to the plaintiff, and, if available, the cost. Next we would have been called upon to consider the comparative merits of such patented devices, as compared with the existing plant of the plaintiff, opening a third field of opinion evidence. Finally, the cost of such installation would be taken up by still other experts.

It is not inconceivable that more than one such patented device exists, in which event, having once launched into this field, we should be called upon to cover the same by receiving and considering this class of evidence with reference to each device that either side might choose to present as an efficient substitute. If such evidence be deemed available with reference to holders, it would be equally available as to each other factor which goes to make up the plant of the plaintiff. A single example may illustrate my thought. Experts could be called to show that the land occupied by the plaintiff was not best suited to its purpose, and that, by reason of the development of the community, their stations might more profitably or economically be elsewhere located. One might recommend water front property, because of the ease in receiving supplies delivered by water, while another might recommend a location adjacent to the railroads, and still a third might be governed by proximity to the consumer. Examples might be multiplied, but sufficient has been said to indicate the reasons that constrained me to reject this evidence as not within the issues of this action and as not constituting facts relevant to the task of ascertaining the fair value of plaintiff's property utilized in its service on the 1st day of June, 1923, although the learned Attorney General adroitly suggested that such evidence might be admitted as a "relevant fact."

In support of their contention, counsel for the defendants cite the recent decision of the United States Supreme Court in Pacific Gas & Electric Co., 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075 (decided June 2, 1924). In that case, the company had, as matter of fact, acquired and utilized certain letters

patent, which resulted in a lower cost of operation, and the Supreme Court took the view that insufficient allowance had been made for the patent rights thus acquired, saying: "As an operating unit the new combination had greater value than the old; but the court below disregarded the demonstrated worth of the element which wrought this change."

And again: "The operating plant, made capable of producing gas at smaller cost, was declared less valuable than before. The result indicates error somewhere, either in theory or application of principle."

The court was there dealing with established and demonstrated facts, and was considering the means that had been adopted by the court below in ascertaining the "fair value" of the company's plant, which included the letters patent in question. I find in that case no authority for entering the field of speculation through a contest of experts as to whether or not the present value of plaintiff's plant would be enhanced, or an efficient substitute therefor be more economically reproduced, by adopting some new or different type of construction or process of manufacture to be rendered available by the acquisition of alleged outstanding patent rights.

### Working Capital and Rate Base.

A marked difference of opinion exists between counsel for the respective parties as to the amount to be properly allowed as working capital. While defendants have introduced no evidence challenging the opinion of Col. Miller that $7,000,000 is a reasonable amount, yet through cross-examination the subject has been so far analyzed as to warrant a modification of that estimate. Recalling the uses to which working capital is put as shown by Col. Miller in Plaintiff's Exhibit 283, it would appear from Plaintiff's Exhibit 259 that the amount actually employed by plaintiff in 1922 and in 1923 averaged about $10,000,000. I allow $5,000,000 for this item. The rate base is thus established at $55,000,000 as of June 1, 1923.

Between June 1, 1923, and December 31, 1923, there were additions to the capital of the plaintiff, which, after deducting withdrawals, aggregated the net amount of $3,856,971. Of this amount, the property devoted to the use of the subsidiary companies is allocated in the amount of $764,458 (Plaintiff's Exhibit 310; Defendants' Exhibit 46), making the rate base $58,092,513 as of December 31, 1923.

### Cost of Manufacture.

Plaintiff makes carburetted water gas. In the processes of manufacture many commodities are utilized among others, coal and coke as generator fuel as well as boiler fuel. Gas oil is an important factor, and the B. t. u. content turns upon the quantity of oil used in the manufacture of gas. Shavings and oxide also enter into the processes. There is a by-product of tar, and drip oil is salvaged. The tar is used as fuel, and the drip oil is sold. In ascertaining the cost of manufacture, credit is given for the tar and for the drip oil. Water is, of course, largely used. Labor in the manufacturing processes and labor and material in the matter of repairs constitute factors of manufacturing expense.

The books of the plaintiff are so kept that, while the plaintiff manufactures and sells to the subsidiaries all gas supplied to the latter's consumers, yet the cost of the gas distributed to its own consumers is properly shown. Plaintiff's books of account are in evidence. Tabulated statements were prepared showing what is recorded in these books as the cost of gas manufactured and distributed in the year 1922 (Plaintiff's Exhibit 257), and also the cost of gas manufactured and distributed in 1923 (Plaintiff's Exhibit 258). The cross-examination of the plaintiff's witnesses on this branch of the subject was designed to analyze all of those figures exhaustively. The methods employed by the plaintiff in obtaining its supplies of coal, coke, gas oil, and so forth, were carefully scrutinized, but developed nothing which seems to be properly the subject-matter of criticism. Bids seem to have been sought in the open market from all available sources, and purchases ultimately made in the exercise of the discretion vested in executive officers. These purchases involved a consideration of the prices at which these commodities were offered, the ability of the bidders to supply the appropriate quantities, the storage capacity of the plaintiff, and the wisdom of having more than one source of supply available, as well as the quality of the merchandise itself. Defendants have offered no evidence challenging the propriety of these transactions, and the record indicates that the prices paid by the plaintiff were reasonable, based upon the mature judgment of its officers after appropriate investigation of market conditions.

A great deal of attention has been given to the relations existing between the plaintiff and its subsidiary corporations, particularly the price charged by the former to

the latter for gas manufactured by the plaintiff and supplied to these subsidiaries for distribution among the consumers of the latter. Inasmuch as the plaintiff owns all of the capital stock of these subsidiary corporations, it is apparent that opportunity is available to make the price charged such that an unconscionable profit might be realized, either by the plaintiff as vendor, or by the subsidiaries as vendees, and counsel for defendants have subjected these relationships to the most rigid scrutiny.

It seems that each year the plaintiff estimates the quantity of gas that will be needed by the subsidiaries during the forthcoming year, basing this estimate upon the experience of the past and the indications of the future. The price charged the subsidiaries is the result of a calculation based upon an estimate of cost of manufacture, cost of distribution, and quantity to be consumed. It has been made to appear that these estimates were not always accurate; that is to say, that at the end of a year the actual cost of production or the actual quantity of gas taken by the subsidiaries and distributed to their consumers was not precisely that which had been estimated. These intercorporate relationships are properly the subject of judicial scrutiny in such an action as this, and I have been at great pains to afford counsel for defendants unlimited opportunity of investigation, and have considered all that has developed as a result of that inquisition. I find nothing to criticise. There is nothing in the record which suggests a relationship between the plaintiff and its subsidiaries operating unfairly or unjustly upon either side of the bargain. It is urged by counsel for the defendant that when, at the end of a given year, the facts have been developed, then the estimate made at the beginning of the year should be disregarded, and we should base our calculations upon the facts as they actually transpired. Perhaps, where we are concerned with the question of the confiscatory nature of a statute, this is theoretically true, but the differential I find to be so small that it seems negligible. The necessity for operating a vast industry of this nature on a budgetary basis is so apparent that, unless a marked discrepancy between estimate and experience should have developed, it would not seem that the court was justified in recasting the system of accounting. If an abuse had been shown to exist, or if this method of dealing with the subsidiaries had been shown to be a cloak for an artificial calculation of cost

of manufacture, the court would be quick to seize upon the facts in that regard and apply a correcting method.

A great deal of attention has also been given in the cross-examination to the cost of manufacture in each of the several plants of the plaintiff. This cost is not uniform. The plants are not equally well equipped. Some have more modern devices than others. It appeared in evidence that in some instances the cost of manufacture was somewhat increased at a given plant because certain repairs were in progress during the period under consideration. That work having been accomplished, presumably a similar condition would develop in some other plant, as the process of repair, rebuilding, and installation of betterment is incidental to the life and progress of such an industry.

Col. Miller, an expert called for the plaintiff, testified that he was very familiar with all these plants and with all the processes of manufacture which were there employed. He further testified that he was equally familiar with other plants in the Metropolitan district and elsewhere. He stated that he had compared the operating costs of the plaintiff with the operating costs of other companies throughout the Metropolitan district. He testified that these costs of the plaintiff were reasonable, and that the results of such comparisons did not indicate any unusual feature. The defendants have not controverted this evidence. No expert has been called to challenge this opinion expressed by Col. Miller, and we are left to consider the argument of counsel with reference to some of the factors that enter into the processes of manufacture.

In Plaintiff's Exhibit 264 will be found an exhaustive calculation designed to show the actual results of operation in 1923, when the plaintiff was making 587 B. t. u. gas, using 3.52 gallons of oil per thousand cubic feet at an expense of 5.67 cents per gallon of oil. This calculation is then adjusted in the same exhibit to show what would be the result in manufacturing 650 British thermal units gas, necessitating a consumption of 4.50 gallons of oil per thousand cubic feet at the reduced expense of 4.80 cents per gallon of oil. The results of this calculation indicate that in 1923 it cost the plaintiff 93.95 cents per thousand cubic feet of gas. It further appears that the adjustment to conform to the requirements of the statute under consideration will involve a cost of 95.06 cents per thousand cubic feet of gas.

No corresponding exhibit has been introduced in evidence by the defendants, but certain items here and there have been challenged. A careful analysis of the opposing contentions indicates that the points at issue may be briefly presented, without reproducing the involved calculation which will be found available in the exhibit itself.

It is conceded that the Metropolitan plant is the most modern, and that the cost of manufacture there is less than at the other plants. The defendants urge that this plant should be taken as the standard, and that the cost of manufacture should be calculated on data found here, to the exclusion of any consideration of the cost of manufacture in the other plants of the plaintiff. I have been unwilling to adopt this suggestion, and, in view of all of the evidence submitted upon this subject, see no reason for rejecting the records of this company as the basis of ascertaining the cost of manufacture.

As to repairs, we must either accept the actual amount expended during a given period as, for example, the year 1923 or the year 1922, or average the item of repairs during, say, 5 or 10 consecutive years. Any attempt at the latter method would involve us in the varying cost of labor and material during such period. A calculation based upon the repair items for the last 5 years indicates that the difference between the actual repair item for the year 1923 and such an average would be less than three-quarters of a cent per thousand cubic feet of gas.

It is conceded that in the transmission of gas not all that is manufactured is delivered to the consumers. There is always an item of "unaccounted for" gas. This is due to leakage, condensation, expansion, and contraction, among other things. An allowance must always be made for this item as a part of the cost of manufacture. What percentage shall be thus allowed has been the subject-matter of considerable dispute. This factor varies with the consumption per mile of main, with the number of consumers within a given distance, and with reference to other factors. It seems incapable of determination with precision, but experience enables these companies to determine approximately what this item ought to be. The Attorney General contends that 5 per cent. is an appropriate allowance. The records of the plaintiff indicate what this item amounts to in actual practice with them, and in the absence of any evidence attacking either the integrity of the record or tending to establish extravagance in that regard, I have accepted the company's own records as indicating the allowance that should be made for this item. Plaintiff's Exhibit 258.

A substantial item of expense is charged for the special inspection and adjustment of gas appliances, necessitated by the order of the Public Service Commission which went into effect October 1, 1922, namely, $108,668.23. The defendants challenge this item, and I am of the opinion that it was abnormal and should not be regarded as a part of the cost of manufacture for the purpose of ascertaining whether or not the statutory rate is confiscatory. It is therefore disallowed. A similar argument is made with reference to the cost of maintaining this particular litigation, namely, $94,524.89. For the same reason I disallow this item. As to uncollectible bills, a marked difference of opinion has arisen. The defendants urge that, inasmuch as the statute enables the plaintiff to exact a deposit from each consumer in advance sufficient to cover his probable consumption for a month, and that this custom is so far followed by the plaintiff that it has on hand approximately $2,000,000 thus deposited by consumers, that any loss by way of uncollectible bills must be charged to the inadvertence of the plaintiff in not availing itself of the statutory privilege. This argument seems cogent, and is supported by authority. Reno Power, Light & Water Co. v. Public Service Commission of Nevada (D. C. Nev.) 298 F. 790, P. U. R., 1923E, 485. If the evidence disclosed that these uncollectible bills constituted the differential between the amount of charge against a consumer in excess of the deposits exacted, we would have no difficulty. On the other hand, the matter is one of discretion, and presumably the plaintiff does not exact a deposit from every consumer, although its deposits do amount to the substantial sum above stated. If we are called upon to exclude this item, it must be upon the basis that the court will substitute its own business judgment for that of the executive officers of the company in exercising the prerogative vested by the statute as to security. But the amount is small, and it is easily conceivable that a uniform system of exacting deposits might work hardship here and there, I think the item should be allowed. This view is in accord with that expressed by Judge Mayer in a former case.

The item of gross earnings tax as submitted in plaintiff's calculation requires revision. The plaintiff asserts that this item amounts to $133,254.33. This is challenged

by the defendants upon the ground that it is not calculated upon a charge to the consumers based upon the statute under consideration, namely, $1 per thousand cubic feet, but is calculated on the amount they are actually receiving from the consumers pursuant to the injunction restraining the state from enforcing the statute. The differential appears to be $6,029. I am inclined to think this criticism is sound, and that, for the purpose of this inquiry, the calculation should be based upon the amount which the statute permits them to charge. The item is further challenged upon the ground that it includes a tax upon excess dividends which amounts to $21,600. Defendants' Exhibit 155. I find it difficult to discern the theory upon which this should be included as an operating expense. In a proper case it might become the subject-matter of consideration with reference to the rate of return, but I think it should be eliminated in ascertaining the cost of production. The defendants further call attention to the fact that plaintiff has included taxes on revenue from its subsidiaries amounting to $18,140.76. Defendants' Exhibit 155. It appears, however, that a credit for this item is found under operating expense credit. Plaintiff's Exhibit 258. I therefore recast the item of gross earnings tax as follows: Amount claimed by plaintiff, $133,254.33. I disallow the state tax on excess dividends, $21,600 and the tax on revenue in excess of the $1 rate, $6,029, allowing the net item, $105,625.33.

The evidence discloses that contracts have been made for a supply of oil during the coming year at a somewhat lower price than that which prevailed during 1923. Taking the cost of manufacture in 1923 as a base, the plaintiff has adjusted these figures of actual experience to indicate what it will cost to manufacture and distribute gas of the statutory standard at the lower price of oil during the coming year; in each instance using the quantity of gas produced in the year 1923 as a factor in the calculation. The figures presented in this adjustment and found in Plaintiff's Exhibit 264 are substantially as follows: Gas oil in 1923 cost the plaintiff 5.67 cents. The contracts already closed for the coming year indicate that the cost of gas oil will be reduced to 4.80 cents. In making gas of the standard supplied in 1923, it required 3.52 gallons per thousand cubic feet of gas. In making the proposed 650 B. t. u. gas it will require 4.50 gallons. The total send out is taken at 21,984,891 M cubic feet. Plaintiff's Exhibit 258. Of this, in 1923, 15,300,373 M went to the consumers of the Brooklyn Union. The subsidiaries utilized for their own consumers 4,942,894. The unaccounted for gas amounted to 2,323,321. Plaintiff's Exhibit 263. The result of plaintiff's calculation shows a probable cost of operation under the statute of 95.06 cents per thousand cubic feet of gas.

Counsel for defendants have adopted a process of calculation by which they evolve the contention that this cost of manufacture per thousand cubic feet should be 78.33 cents. In so doing, however (a) they adopt the cost of manufacture at the Metropolitan plant as the standard to govern all cost of manufacture by the plaintiff, to the exclusion of any consideration of other plants; (b) they allow only 5 per cent. for unaccounted for gas; (c) they allow only 3.52 gallons of gas oil in the manufacture of a thousand cubic feet of gas, but the evidence establishes that this quantity of oil produces gas with a lower B. t. u. content, while in order to produce gas with a 650 B. t. u. content it is necessary to utilize 4.50 gallons of oil per thousand cubic feet; (d) they average repairs and closely criticise the miscellaneous and general expense account, the reserve for workmen's compensation, the rent of properties leased, and eliminate the item of uncollectible bills and some other small items; (e) they draw attention to the fact that the plaintiff buys gas appliances and sells them to its own consumers, as well as to the subsidiary corporations, to be in turn sold to the latter's consumers. This branch of plaintiff's activity is carried on along with its major business of gas making and as an incident thereto. An attempt is made by the defendants to segregate the data with reference to the sale of gas appliances.

I have considered these various matters, and my views with reference to most of the items have already been expressed. As to the sale of gas appliances, I see no error in the treatment of that item as found in Plaintiff's Exhibit 264. Appropriate credit is there given for such income as the plaintiff thereby receives. Indeed, after analyzing these figures, I do not appreciate any substantial difference in the result obtained by defendant's method of analysis.

Applying the views which I have above expressed, I arrive at the following conclusion as to the cost of operation:

| Plaintiff claims as its cost per thousand cubic feet to manufacture 650 B.t.u. gas as required by the statute....... | | 95.06 cents |
|---|---|---|
| I disallow: | | |
| The expense of special inspection ........ | $108,688.23 | |
| The cost of pending litigation ......... | 94,524.89 | |
| Certain stated items in the gross earnings tax ............... | 27,629.00 | |
| Making a total of.... | $230,842.12 | |
| Which is the equivalent per thousand cubic feet of....... | | 1.50 cents |
| Leaving ............ | | 93.56 cents |

which I have fixed as the cost of manufacturing 650 B. t. u. gas required by the statute per thousand cubic feet, and which includes the cost of maintaining the gas appliance branch.

It will appear from Plaintiff's Exhibit 264 that in 1923 the plaintiff derived an income from the sale of residuals and gas appliances in the amount of $343,943, which is the equivalent of 2.24 cents per thousand cubic feet of gas sold. The entire operating income of plaintiff at the statutory rate (modified by the lower price at which plaintiff supplies gas to the city of New York) would be $1.0206 per thousand cubic feet of gas sold at a cost of 93.56 cents per thousand cubic feet.

At the time this statute took effect, plaintiff was delivering 580 B. t. u. gas, although by the terms of the order of the Public Service Commission then subsisting (Plaintiff's Exhibit 80) only 537 B. t. u. gas was required. There is no exhibit showing the cost of manufacturing and distributing this standard of gas; yet the data is in evidence from which the same may be calculated. The evidence shows that the first step in the manufacture of carburetted water gas is the decomposition of steam, freeing the hydrogen, which combined with the carbon of coal or coke, produces hydrogen-carbonic oxide gas, known as blue gas, because it burns with a blue flame. It gives no light. This gas has a heating value of about 300 B. t. u. By the addition of oil to the blue gas, the thermal content is increased, which is in turn again lost to some extent in transmission by reason of condensation. Each gallon of oil in a thousand feet of carburetted water gas increases the thermal content 80 B. t. u. per cubic foot. The decrease in thermal content resulting from condensation necessitates the manufacture of gas of a higher thermal content than that required to be furnished. Consequently, in order to furnish 537 B. t. u. to the consumer, it is necessary that the gas at the works should contain 550 B. t. u. per cubic foot. Taking the lower cost of oil, rather than the price actually paid during 1922 and 1923, the cost of manufacture and delivery of 537 B. t. u. gas would be approximately 86.85 cents per thousand cubic feet, disregarding any increase in the required quantity of coal and the loss of volume from the decrease in the quantity of oil.

### Rate of Return.

Expert evidence was introduced by the plaintiff to the effect that a return of 8 per cent. is normal, in view of all the contingencies surrounding the conduct of a business of this character. This seems in accord with prevailing conditions of which the court will take judicial notice, and seems also to be in harmony with current adjudications. The defendants offered no evidence to the contrary. In a very recent case (Ohio Utilities Co. v. Public Utilities Commission of Ohio [decided March 2, 1925] 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656) the Supreme Court held a return of 5 per centum inadequate and confiscatory.

Dr. Hollander, called by the plaintiff as an expert witness, testified that in his opinion prevailing commodity prices would remain substantially staple for a number of years. In disclosing the mental processes by which he arrived at this conclusion, the witness indicated that, as a learned and distinguished political economist, he had studiously addressed himself to the comprehension and analysis of the problem. If this forecast of Prof. Hollander be correct, we must accept the present standards as substantially normal now, just as in the pre-war days we accepted the standards then prevailing as normal then. I have nothing before me indicating a contrary view.

### Yield to Plaintiff.

I construe this statute as requiring plaintiff to deliver to the consumer gas containing the statutory thermal content. There is a loss of thermal content in the transmission of gas due to condensation, among other things, to which allusion has previously been made. It follows that the gas at point of manufacture must contain a greater thermal content than prescribed by the statute in order to insure the required content when

used by the consumer. Recognizing this factor, and adopting 15,300,373 M cubic feet as the aggregate sales of the plaintiff, with reference to which there is no issue, I find the yield to plaintiff in the several alternatives would be as follows:

Operating under the statute, the cost of manufacture and distribution of 650 B. t. u. gas, being 93.56 cents per thousand cubic feet, while the income from the sale of gas, gas appliances, and residuals aggregates $1.0206, the yield would be 8.5 cents per thousand cubic feet, or $1,300,531.71 per annum. This is the equivalent of 2.364 per cent. upon $55,000,000, the rate base as of June 1, 1923, Adopting the rate base as of December 31, 1923, namely, $58,092,513, this income would be the equivalent of 2.24 per cent.

Should the plaintiff continue to manufacture and distribute the standard of gas supplied in 1923 (587 B. t. u.), the cost, reduced by the smaller quantity and lower price of gas oil ultilized, would be 90.49 cents. The sale of this gas at the price nominated in the statute would yield $1,770,253.16 per annum, which is the equivalent of 3.22 per cent. upon $55,000,000, the rate base as of June 1, 1923. If the rate base as of December 31, 1923, be adopted, namely $58,092,513, the yield for the manufacture and distribution of the standard of gas delivered in 1923 would be 3.05 per cent.

If, through any construction of this statute, it should transpire that the plaintiff was permitted to supply to its consumers 537 B. t. u. gas. costing 86.85 cents as previously shown, the sale at the price nominated in the statute would yield $2,327,187 per annum, which is the equivalent of 4.23 per cent. upon $55,000,000, the rate base as of June 1, 1923, or 4 per cent. upon $58,092,513, the rate base as of December 31, 1923.

Resolving all doubts against the plaintiff, I am convinced that property of the plaintiff will be confiscated by operation of the statute in question. Indeed, it is doubtful whether in any view of the situation the yield would be sufficient to meet the recurring payments of interest upon outstanding bonds.

### Contingency Account.

It appeared in evidence that plaintiff maintains upon its books a contingency account designed as a protection against unusual losses, calamities, or expenses. In establishing this account, the board of directors of the plaintiff corporation passed a resolution substantially to the effect that nothing should be charged against this account unless specifically approved by the board. This account now amounts to approximately $13,000,000. It is urged by the learned Attorney General that even though operation under the statute may fail to yield an income to the plaintiff, yet this will not constitute confiscation of plaintiff's property until, by virtue of the losses so incurred through operation under the statute, this contingency fund shall have become exhausted. I am unable to concur in this view. The reserve represented by this account is the property of the plaintiff. In the exercise of their discretion, the board of directors have chosen thus to safeguard the capital investment of the stockholders against an unforeseen calamity. In the exercise of that same discretion, it would be competent for the board to reduce the reserve, recognizing that it is after all an accumulation of undistributed profits, and declare a dividend payable out of the same. Indeed the expense of maintaining this litigation and the expenses incurred through the readjustment of appliances upon consumers' premises necessitated by the order of the Public Service Commission of August 30, 1922, might, with propriety and in the exercise of that discretion, be charged against the same.

I am unable to discern by what authority the state may confiscate a surplus and yet be deterred from confiscating capital. It is certainly true that, if the cost of manufacturing and distributing gas were unconscionably increased, or the apparent earnings of the plaintiff were unconscionably decreased, by the maintenance of an extravagant contingency reserve charged into operating expenses, this might be the proper subject of judicial review. No evidence, however, has been submitted to me tending to show such a condition of affairs. The reserve does not exist as a fund, but only as a part of the general assets of the plaintiff, and is not charged into operating expenses.

### Going Concern Value.

While there is authority for the proposition that going value may be based upon the financial history of the company, though not in the sense that losses are to be thereby capitalized, yet the plaintiff disclaims any effort to adopt either the basis of early losses or that of the financial history of the company. Indeed, there is no evidence in the case to support such a calculation. The Supreme Court has said "that there is an element of value in an assembled and es-

tablished plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use." Des Moines Gas Co. v. Des Moines, 238 U. S. 153 (see page 165) 35 S. Ct. 811, 815 (59 L. Ed. 1244).

As stated by the statutory court in New York Telephone Co. v. Prendergast (D. C.) 300 F. 822: "The amount may be difficult of ascertainment, but that going [concern] value exists is self-evident."

Running all through the cases, there seems to be the doctrine that no hard and fast rule exists by which going concern value is to be calculated. There is, however, a definite recognition of the difference in value between a concern without consumers and a concern that is prosperous with its consumers. While this is not to be confused with the term "good will," nor to be treated as synonymous with that term, yet the existence of going value as intangible property is recognized in estimating the cost of reproduction. Apparently, the conclusion arrived at should reflect the sound judgment of the court upon all of the facts presented by the evidence in each case.

Plaintiff rests its contention upon the testimony of Col. Miller, who expressed the opinion that the going concern value of this plaintiff aggregated $16,055,200. Col. Miller arrived at this figure by adopting the meters in use as a unit, 458,720 in number, and by estimating that each consumer added a value of $35 to the value of the plant inert. The witness predicated this opinion upon a condition of affairs without precedent in his experience, and I think we may be permitted to add, without precedent at all. He assumed to visualize a community such as the borough of Brooklyn, covering a territory of approximately 72 square miles, having a population of over 2,000,-000, in which the service of gas had never been installed. He estimated the cost of educating that community to the advantages and disadvantages of gas on June 1, 1923, upon the assumption that the community enjoyed all other utilities, such as water and electricity, but as yet had not experienced, the service of gas, and further testified:

"I mean that in my opinion a property similar to the Brooklyn Union Gas Company would be worth more if the consumers were attached on June 1, 1923, than it would be if there were no consumers but the company was ready to deliver gas. I mean that in my opinion a purchaser of the property would pay $16,055,200 more for the property if the consumers were attached and it was run economically, than he would if they were not attached. The difference between the value of the property in my opinion with the business attached, and the value of the property without the business attached, is the cost of annexing the business, such cost being $16,055,200. What guides me is the actual amount we spent in American cities to intensively build up the business, the business being there already, but just to increase it. That is my guide, and that is what I based all of this estimate on."

Such is substantially the evidence presented upon this question, except that the plaintiff acquired the properties of the several vendor companies each as a going concern, thereby eliminating whatever factor of competition may have previously existed among the vendors, and has thus unified the properties, and except also that the outlays of plaintiff in the year 1923 indicate that promotion expenses, cost of setting meters, appliances, etc., averaged about $33 per meter during that year. Col. Miller's attitude is substantially to the effect that the hypothetical situation submitted to him for an opinion was unprecedented in his experience, although he had repeated experience in taking over going concerns and then by intensive effort broadening their activities, enlarging their output, and annexing new consumers. Guided by the amount which he had actually expended in thus developing going concerns, he expresses the opinion that the sale or exchange value of a plant without consumers would be increased at the rate of $35 for each meter installed, when operated economically as a going concern.

Counsel for plaintiff has very industriously collated allowances for going value in court cases and in commission cases, showing what percentage upon the total property value was allowed in each instance. This compilation would indicate that, where these allowances have been made, the quantum has averaged about 12 or 13 per cent. of the property value. The method of measuring going concern value adopted by Col. Miller, however, seems somewhat novel and without precedent in any of the adjudica-

tions to which my attention has been directed. The hypothesis is so difficult to conceive and so contrary to general experience that the imagination falters. If one were to indulge in such an imaginative picture, it would seem more readily conceivable that the demand by the community would greatly overtax the production capacity of the company, rather than to assume the necessity for an outlay of $35 to educate each consumer and convince him of the desirability of utilizing plaintiff's output.

The more I have considered this evidence of Col. Miller, the more reluctant I have become to adopt his estimate for the purpose of evolving some fixed allowance of going concern value. It cannot be doubted, I think, that going concern value exists in the instant case and may properly be allowed as a part of the cost of reproduction. The uses of gas has varied since the plaintiff was incorporated, and, while it may be recognized that little is to be done by way of education in the use of gas as an illuminant, much has been done and is being done, by way of promoting the use of gas as a fuel, not only for domestic purposes, but in manufacturing industries. I am of the opinion that, even disregarding the testimony of Col. Miller, the authorities would justify an allowance upon the balance of the evidence in the case in the quantum to which I have alluded, approximately 12 per cent. of the property value, or about $6,000,000. On the other hand, in Des Moines Gas Co. v. City of Des Moines, supra, this factor of going concern value was recognized, and yet no specific allowance was made by way of valuation. I have, however, chosen to eliminate any allowance for going concern value in ascertaining reproduction cost or in adopting a rate base. All doubt is thereby resolved against the plaintiff, and the statute has still been shown clearly confiscatory.

### Construction of Statute.

It remains to consider the effect of this conclusion upon other provisions of the statute, and to analyze the conflicting views of counsel with reference thereto. The plaintiff does not challenge the power of the Legislature to require it to furnish 650 B. t. u. gas, nor does it contend that distribution of gas of this standard is impracticable, nor again does the plaintiff characterize the statutory standard as unwise, wasteful, or unreasonable. The difficulty of which plaintiff complains is the danger to

7 F.(2d)—42

life and health, involved in distribution of gas of this standard without first making appropriate readjustments in the appliances used by each consumer. That this danger is real and in no sense imaginary or exaggerated is indicated by the fact that the evidence of the plaintiff in this regard is uncontradicted. That the readjustments to which plaintiff refers will require a substantial period of time and involve a substantial outlay of money is indicated by the fact that the prior adjustments cost the plaintiff over $100,000, and consumed many weeks. The provision, "this act shall take effect immediately," is construed by the plaintiff to require the plaintiff to deliver gas of the new standard after midnight upon the day when this act took effect, June 2, 1923. If the statute be thus construed, the plaintiff, on the one hand, would not have been permitted to deliver the gas then stored in its holders and mains, and, on the other hand, would not have been afforded opportunity to make the readjustments required to safely deliver 650 B. t. u. gas. The provision as to standard would therefore become incapable of performance.

It is urged, however, by the Attorney General, that, if the provision as to standard be incapable of performance, the effect would be to relegate the plaintiff to the order of the Public Service Commission dated August 30, 1922 (Plaintiff's Exhibit 80), which was in operation at the time the act was passed. It may be doubted whether that order of the Public Service Commission still subsists. I am inclined to the view that the order of the Public Service Commission dated June 4, 1923, requiring the plaintiff to comply with the provisions of the statute operated to supersede the order of August 30, 1922. Again, this view would not contemplate a revival of the order in its entirety, but only so much thereof as prescribed a standard. Finally, it has been shown that the rate of $1 per thousand cubic feet of 537 B. t. u. gas would be confiscatory. The suggestion must be rejected.

The order of the Public Service Commission, requiring plaintiff to comply with the statute, was dated June 4, 1923, 2 days after the statute became effective. This order is annexed to and made a part of the answer of the defendants Public Service Commissioners, and reads in part as follows:

"Ordered, that each and every gas corporation engaged in the business of manufacturing, furnishing, or selling illuminating gas in the city of New York be and hereby

is required forthwith to comply with such statute, and be and hereby is authorized to file and publish a new schedule of its rates for gas effective forthwith in accordance with said statute."

The commission seems to have based its order upon the construction of the statute adopted by the plaintiff, namely, that plaintiff was required to furnish gas of the new standard after midnight of the day the act took effect. Both the Attorney General and counsel for the defendants Public Service Commissioners, however, now advance the theory that there should be read into this statute an intention by the Legislature to allow a reasonable time to the plaintiff and other gas companies thereby affected within which to make the necessary adjustments of appliances, and that the provision, "this act shall take effect immediately," should be construed accordingly. Such a construction, or indeed, the inclusion of express language to that effect in the statute, would leave the plaintiff in a position where it could not know in advance whether or not its act was in violation of the statute. "The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable." Tozer v. U. S. (C. C.) 52 F. 917; Railway Co. v. Dey (C. C.) 35 F. 866, 1 L. R. A. 744. I reject this view.

It is a settled rule of statutory construction that an original statute with all its amendments must be read together, and that, in considering an amendatory act, the legislative intention should be sought by joining the amendment with the act to which it is an addition, and considering the whole as one act passed at the same time. Lyon v. M. R. Co., 142 N. Y. 298, 37 N. E. 113, 25 L. R. A. 402.

The act in question is entitled "An act to amend the Public Service Commission Law in relation to the charge for illuminating gas in cities containing a population of one million or over." The amendment introduced a new section containing the provision as to standard and the provision as to rate in a single sentence. Prior to the passage of this amendatory act, section 66 of the Public Service Commission Law vested in the commission power to prescribe the standard of quality, and section 72 vested in them power to regulate the price to be charged consumers. This amendatory act has limited the discretion of the commission as to standard and likewise as to price. While the form of the statute is not such that it specifically amends the sections above referred to, in substance that is its effect. Viewing the statute thus amended as one act, we note that it creates a commission, prescribes its jurisdiction, nominates the utilities over which that jurisdiction is to be exercised, and confers power to prescribe a standard not less than 650 B. t. u. gas per thousand cubic feet, and power to regulate the price to be charged consumers not more than one dollar per thousand cubic feet. The statute would thus be viewed as an indirect exercise of the police power of the state, as opposed to a direct exercise thereof, such as is found in chapter 125 of the Laws of 1906 (the Eighty-Cent Gas Law). This construction would attribute to the Legislature a realization that the commission was in existence, possessing the regulatory powers expressed in the statute. The provision, "this act shall take effect immediately," would be deemed to impose an immediate duty upon the commission to carry the law into effect, as thus amended, through appropriate orders, adressed to these utilities, making due allowance for the time to be consumed and the preparation to be made to conform to the new order of things. The provision as to rate having been found confiscatory, that as to standard would be deemed to survive, while the orders of the Public Service Commission, requiring compliance with the standard, as well as its further orders, fixing new rates, would be subject to judicial review as provided in the original statute.

I should be disposed to adopt such a construction, were it not that the learned counsel for plaintiff has pointed out that, even so, upon the authority of Bronx Gas & Electric Co. v. P. S. Comm., 108 Misc. Rep. 180, 178 N. Y. S. 172, s. c., 190 App. Div. 13, 180 N. Y. S. 38, the further provision of the statute would survive, namely, "the Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum." As a result, we should have a statute requiring the delivery of 650 B. t. u. gas, and divesting the Public Service Commission of power to allow a constitutional rate, inferentially reserving that power to the Legislature itself. Morrell v. Brooklyn Borough Gas Co., 195 App. Div. 1, 185 N. Y. S. 883; Id., 231 N. Y. 398, 132 N. E. 129. This would leave the plaintiff without restraint as to price to be charged its consumers. Surely such a construction would be at variance with the clear

purpose of the act. It must therefore be rejected.

Aside from that difficulty, however, it may well be doubted whether the statute is capable of any construction whereby the provision as to standard would be deemed severable from that as to rate. The defendants urge that either will survive if one be found vulnerable, while plaintiff contends that the two must stand or fall together. In New York & Queens Gas Co. v. Prendergast et al., 1 F.(2d) 351, the special master construed these provisions as severable, but the United States District Court for the Southern District of New York (Winslow, J.) held to the contrary.

The provision as to standard is incapable of performance and the rate has been shown confiscatory. I am of the opinion that the entire statute is unconstitutional. Perhaps the doubt as to legislative intent concerning the survival of either provision to the exclusion of the other is sufficiently pronounced to support the same conclusion under the authority of Butts v. Merchants' Transportation Co., 230 U. S. 126, 33 S. Ct. 964, 57 L. Ed. 1422. If the court shall concur in the view of Judge Winslow, the same result follows.

I am of the opinion that, were the plaintiff required to furnish to its consumers at the maximum price prescribed by the statute gas of the standard nominated in the statute, or gas of the standard supplied by the plaintiff during the year 1923, or gas of the standard required by the order of the Public Service Commission in operation at the time the statute was passed, the plaintiff would, in either event, be deprived of property without due process of law. I am of the opinion that the statute violates section 1 of article 14 of the federal Constitution. I am of the further opinion that the provision of the statute with reference to standard is incapable of performance, and that the statute is void in its entirety. I recommend that a decree enter accordingly.

Herewith will be found my findings of fact and conclusions of law, in accordance with the views I have expressed.

Cullen & Dykman, of Brooklyn, N. Y. (William N. Dykman and Jackson A. Dykman, both of Brooklyn, N. Y., of counsel), for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y. (Edward M. Deegan and Melvin L. Krulewitch, both of New York City, of counsel), for defendants William A. Prendergast and others.

John Holley Clark, Jr., of New York City (William Hayward and Charles E. Buchner, both of New York City, of counsel), for defendant Albert Ottinger.

CAMPBELL, District Judge. This is an action in equity, the object of which is to have declared unconstitutional, as confiscatory and void, chapter 899 of the Laws of 1923 of the state of New York, which prescribes a maximum rate, in cities containing a population of 1,000,000 or over, of $1 per 1,000 cubic feet of gas of a standard of not less than 650 B. t. u. per cubic foot, and for an injunction restraining the defendants from enforcing or attempting to enforce the provisions of said act.

New York City is the only city of the state which contains a population of over 1,000,000.

This case comes before the court on the motion of the plaintiff for an order sustaining the plaintiff's exceptions to the special master's report, filed herein, and confirming the said report in all other respects, and for a final decree.

The motion came on to be heard on the 15th day of April, 1925, and was, at the request of the attorney for the Attorney General of the state of New York, adjourned to May 5, 1925, when it was argued and all briefs finally submitted.

I agree with all the counsel in this case that the provisions of the Act Feb. 13, 1925 (43 Stat. 938), amending section 238 of the Judicial Code, which went into effect May 13, 1925, do not apply, inasmuch as the case was finally submitted before a court consisting of three judges could be called, and that, having been finally submitted before such statute went into effect, this court has power to determine this motion and enter a decree.

A preliminary injunction was granted to the plaintiff herein on July 2, 1923, by the statutory court in this District, composed of Circuit Judge Mayer and District Judges Garvin and Campbell, which enjoined the enforcement of the statute, chapter 899, supra, upon the condition, among others, that the plaintiff, pending final decree or until the further order of the court, continue to furnish gas at the rates theretofore fixed and of the thermal content theretofore prescribed by the Public Service Commission as a basis for said rates.

By an order dated October 11, 1923, granted by me, the matter was referred to Almet Reed Latson, Esq., as special master, which

order directed him to hear the evidence, make all computations, find the facts and report with recommendations.

The hearing commenced promptly after the master's appointment and proceeded with due diligence. The special master has fully complied with that order, and filed a report which contains a careful and thorough recital of the questions of law and fact, and his findings, together with a well-considered opinion, in which report he recommends the entry of a final decree in favor of the plaintiff.

Plaintiff and defendants have filed numerous exceptions to portions of the master's report.

Chapter 899 of the Laws of 1923 of the Laws of the state of New York, entitled "An act to amend the Public Service Commission Law, in relation to the charge for illuminating gas in cities containing a population of one million or over," became effective on June 2, 1923, and amended the existing statute by adding a new section as follows:

"Sec. 67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The public service commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

Plaintiff contends that the said act is unconstitutional on two grounds:

(1) That it impairs the obligation of a valid subsisting contract, in violation of the provisions of section 10 of article 1 of the federal Constitution.

(2) That it is confiscatory, and deprives the plaintiff of its property without due process of law, in violation of section 1 of article 14 of the federal Constitution.

I will consider these contentions in that order.

After the former Eighty-Cent Law had been declared unconstitutional, the Public Service Commission instituted two proceedings, which resulted in two orders dated August 30, 1922—one of which fixed a maximum rate of $1.15 per thousand cubic feet of gas to be charged by the plaintiff and its subsidiary companies, and provided that this rate should remain in operation for one year from October 1, 1922; the other order, which became effective October 1, 1922, changed the standard of gas to be furnished by the plaintiff and its subsidiary companies from 22 candle power to a minimum of 537 B. t. u.

The plaintiff proceeded to comply with these orders, and during the year 1923 expended $108,668.23 in making adjustments of consumers' appliances and those in process of manufacture, in order to make it safe to burn gas of the standard so fixed, instead of 22 candle power gas as prescribed by the former statute. The act complained of became effective on June 2, 1923, while these orders were still in force.

Plaintiff cites, in support of its contention, New York & Queens Gas Co. v. Prendergast, 1 F.(2d) 351, decided by Judge Winslow in the United States District Court for the Southern District of New York.

The act complained of applies to all the gas companies of the city of New York, and I realize how important it is not to have any conflict in the decisions of the courts in adjoining districts of the same circuit on any question, whenever it can be avoided, but the special master in this case has reported adversely to this contention of the plaintiff, and in his opinion has set forth his reasons for such report, with a citation of authorities.

The question is one of the utmost importance, because, if plaintiff's contention should be sustained, further consideration of the many other questions presented might not be necessary.

[1] A consideration of the authorities shows that the power of the Legislature to authorize the making of a contract as to rates is limited. The regulation of rates to be charged by a public utility is an exercise of the police powers of the state (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77); and contracts cannot be made which in any way impair or limit this power, nor can one Legislature limit or control a subsequent one in its exercise (B. E. S. R. Co. v. B. S. R. Co., 111 N. Y. 132, 19 N. E. 63, 2 L. R. A. 284; Manigault v. Springs, 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274). Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of the contract can extend to defeat the legitimate government authority. Union Dry Goods Co. v.

Georgia Public Service Corporation, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420.

It has likewise been held that the Legislature, for the public welfare, may modify regulations regarding rates which municipalities may impose in granting licenses or permission to use its streets by public service corporations, without impairing the obligation of a contract within the provisions of the Constitution. People ex rel. Village of South Glens Falls v. P. S. Comm., 225 N. Y. 216, 121 N. E. 777.

It has also been held that neither the "contract clause" nor the "due process clause" of the federal Constitution has the effect of overriding the power of the state to establish all the regulations reasonably necessary to secure the health, safety, or general welfare of the community. Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 34 S. Ct. 364, 58 L. Ed. 721. As thus limited the Legislature had authority to empower the Public Service Commission to contract on behalf of the state.

[2] The authority of the Public Service Commission to contract on behalf of the state must be found in some express grant, as such authority will not be implied. Milwaukee Elec. Ry. v. Wisconsin R. R. Com., 238 U. S. 174, 35 S. Ct. 820, 59 L. Ed. 1254; Home Telephone Co. v. Los Angeles, 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176.

[3] The Public Service Commission Law of New York State (Laws of 1910, c. 480), created a commission, and by general provisions fixed its jurisdiction, power, and procedure.

Section 22 of the law, among other things, provided:

"After an order has been made by a commission any corporation or person interested therein shall have the right to apply for a rehearing in respect to any matter determined therein, and the commission shall grant and hold such a rehearing if in its judgment sufficient reason therefor be made to appear. * * * If, after such rehearing and a consideration of the facts, including those arising since the making of the order, the commission shall be of opinion that the original order or any part thereof is in any respect unjust or unwarranted, or should be changed, the commission may abrogate or change the same. * * *"

Section 65 of that law provides:

" * * * All charges made or demanded by any such gas corporation, * * * for gas * * * shall be just and reasonable and not more than allowed by law or by order of the commission having jurisdiction. * * *"

Section 66 of that law, among other things, provided:

"The commission shall * * *

"3. Have power by order to fix and change from time to time standards of the purity, illuminating power and heating power, and standards for the measurement thereof, of gas to be manufactured, distributed or sold. * * *"

Section 72 of that law, among other things, provided:

" * * * After a hearing and after such an investigation as shall have been made by the commission * * * the commission may, by order, fix just and reasonable prices, rates and charges for gas * * * to be charged by such corporation or person, for the service to be furnished notwithstanding that a higher or lower price has been theretofore prescribed by a general or special statute, contract, grant, franchise condition, consent or other agreement. * * * The price fixed by the commission under this section or under subdivision five of section sixty-six shall be the maximum price to be charged by such * * * corporation * * * for gas * * * for the service to be furnished within the territory and for a period to be fixed by the commission in the order, not exceeding three years except in the case of a sliding scale, and thereafter until the commission shall, upon its own motion or upon the complaint of any corporation, person or municipality interested, fix a higher or lower maximum price of gas * * * to be thereafter charged. * * *"

The Public Service Commission Law must be considered as a whole, and from it we find that the commission was empowered to fix the standard of purity from time to time, and to fix the maximum rates by order for a term not exceeding three years, but the act also empowered the commission to change or abrogate both classes of orders upon a rehearing.

The commission could not have greater power than the Legislature from which it received its power, and, had the rate been fixed by an act of the Legislature, it could have been modified or repealed by the same or a succeeding Legislature. Village of Saratoga Springs v. Saratoga Gas, etc., Co., 191 N. Y. 123, 83 N. E. 693, 18 L. R. A. (N. S.) 713, in which case the situation created by an order fixing the price of gas for a stated period of time was described as a "period of

repose," and in which a prior statute was under consideration and held unconstitutional, on other grounds, but contained the 3 years' provision, Chief Justice Cullen, writing for the court, said, at page 149 (83 N. E. 701): "We have no difficulty in upholding the provision that the rate shall remain as established for the term of three years."

And at page 150 (83 N. E. 701) said: "The learned court below said that the company would be in no worse condition than if the Legislature had itself fixed rates, for in such case the rates would be permanent until the statute enacting them had been modified or repealed. This is doubtless true; but statutory rates would operate equally on both parties."

The evidence shows that the plaintiff, after such orders were made by the commission, and relying on them made substantial expenditures in adjusting appliances to, meet the conditions created by the change in the standard; but, even under the statute which gave the commission the power to fix standards, the commission was given power to change them from time to time and not to establish them for any definite time; and, as has already been shown, the order fixing the price of gas for one year was subject to change or abrogation by the commission and to repeal by the Legislature.

[4, 5] In any event the plaintiff, by the making of such expenditures, could not prevent or postpone the exertion by the state of the power to regulate the rate to be charged. Producers' Transp. Co. v. R. R. Com'n, 251 U. S. 228, 40 S. Ct. 131, 64 L. Ed. 239.

The contract, if there be one, must be found in the orders and the acceptance. The acceptance is provided for in section 23 of the Public Service Commission Law, but its sole purpose is to indicate whether the corporation will comply with or contest the order in the courts.

A contract binding the succeeding Legislature cannot arise as the result of the acceptance of the order, where the commission was without power to make such a contract. Whatever may be the construction placed upon section 72 of the Public Service Commission Law, supra, the commission clearly had no power to fix the standard for any definite period of time; therefore, if there was a contract, it must be found in the order of the commission fixing the rate, dated August 30, 1922, the parts of which material to this issue read as follows: "That this order shall take effect October 1, 1922, and shall continue in force until September 30, 1923, and thereafter until the commission shall otherwise order."

And the following paragraph: "Further ordered that this order shall be without prejudice to the right of any interested party to apply to the commission for a continuance of the hearings in these proceedings for the purpose of presenting the evidence relating to the subject-matter of this order."

The plaintiff notified the commission "that the said order of August 30, 1922, and the terms and conditions thereof, are accepted and will be obeyed," but qualified the acceptance as follows: "This acceptance and statement of readiness to obey the said order dated August 30, 1922, is not intended as a concession by the Brooklyn Union Gas Company that the rates therein prescribed are adequate or reasonable or that such rates and classifications of service will yield a proper return upon the value of the property, used and useful, in its business. Such acceptance and statement of readiness to obey is not intended as a waiver of any right at any time in the future to claim a return upon the value of its property at the time or any other right which it may have with reference to the rates, past, present or future."

It thus appears that neither the commission nor the plaintiff agreed without reservation that the rates should continue for a definite time, but each reserved the right to recede from the provisions of the order.

In my opinion, Mobile Gas Co. v. Patterson (D. C.) 293 F. 208, the authority cited in New York & Queens Gas Co. v. Prendergast, supra, seems to me to be clearly distinguishable. In that case the state of Alabama had provided that the value of the property of a public utility corporation should, on its application and payment of expenses, be determined by the Alabama Public Service Commission, and that the value so fixed should constitute the permanent basic valuation of the property as of the date of the valuation for all future rate-making purposes.

By that method a fact—the value of the property as of a certain date—was established for future rate-making purposes, and the court held that, by the acceptance of the state's offer by the public utility corporation, and the payment by it of the expenses, a contract had been consummated.

By the contract there sustained no attempt was made to fix a rate or to contract away the exercise of the police power of the state, while in the case at bar plaintiff seeks to establish a contract which would fix a rate

and prevent the state from exercising its police power for the term of one year from October 1, 1922.

I therefore hold that the statute in question does not violate section 10 of article 1 of the Constitution.

[6] This brings us to a consideration of the question whether the act should be declared unconstitutional on the ground that it is confiscatory.

Plaintiff contends that there is no presumption in favor of the validity of the statute, and cites in support of its contention what was said by Circuit Judge Mayer, of the statutory court, on the application for an interlocutory injunction. I do not understand, however, that the statutory court denied the presumption of validity to the act complained of, but on that application, where the decision was necessarily made on affidavits, the weight of evidence necessary to overcome that presumption, and warrant granting a preliminary injunction, was of course a matter for consideration, and to determine that question attention could be given to the fact that there was no showing of any investigation of the subject by the Legislature before the passage of the act, and to the further fact that the Public Service Commission had, within 10 months prior to that time, concluded an investigation and fixed a higher rate, viz. $1.15 per thousand cubic feet, for a period which would not have expired for about 4 months after the date on which the statute was enacted, and had established a lower standard of 537 B. t. u.

Of course it may well be said, Why have a Public Service Commission to fix rates and standards, and then override their determinations based on expert investigation? But that is not a question for this court to decide.

The Legislature alone was charged with the duty of determining the policy of the state, and its action cannot be reviewed if the enactment was constitutional; therefore it seems to me that on this hearing the law is well settled that the Legislature is presumed to have acted within its power in enacting a particular statute, and that, in the absence of unequivocal and convincing evidence, the act of the Legislature in fixing rates will be presumed to be valid and fair (Chicago, Milwaukee & St. Paul Railway v. Tompkins, 176 U. S. 167, 20 S. Ct. 336, 44 L. Ed. 417; Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. [N. S.] 932, 14 Ann. Cas. 764; Des Moines Gas Co. v. Des Moines, 238 U.

S. 153, 35 S. Ct. 811, 59 L. Ed. 1244), and the burden is cast upon the plaintiff to prove the unconstitutionality of the act beyond a reasonable doubt (Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162; Ogden v. Saunders, 12 Wheat. 212, 6 L. Ed. 606; Phœnix Ry. v. Geary, 239 U. S. 277, 36 S. Ct. 45, 60 L. Ed. 287).

Plaintiff has not attempted to comply with the statute, but is operating under an injunction issued out of this court, and furnishing gas at the rate and of the standard prescribed in the orders of the Public Service Commission which were in force at the time the said act became effective.

[7] The defendants contend that the act should not be declared confiscatory until the plaintiff has experimented with the statutory rate, and cite Louisiana Railroad Commission v. Cumberland Telephone Co., 212 U. S. 414, 29 S. Ct. 357, 53 L. Ed. 577, City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371, and other cases.

There is, however, a well-recognized exception to that rule laid down by the United States Supreme Court in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, where, on a challenge of the constitutionality of chapter 125 of the Laws of 1906, the court denied the relief sought, without prejudice to the institution of a new action should the result of experience indicate necessity therefor. The court said, at page 42 (29 S. Ct. 196): "Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory nature, and in that event there should be no hesitation in so deciding and in enjoining its enforcement without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate."

And in Knoxville v. Knoxville Water Co., supra, cited by the defendants, in which, at page 17 (29 S. Ct. 153), Mr. Justice Moody, writing for the court said: "It cannot be doubted that in a clear case of confiscation it is the right and duty of the court to annul the law."

[8] Plaintiff contends that it has brought itself within the exception. On June 2, 1923, when the statute in question went into effect, the plaintiff was furnishing gas of 587 B. t. u., and evidence has been produced to show the actual cost of furnishing that gas, and the estimated cost of furnishing gas of 537 B. t. u., the standard fixed

by the commission, and of 650 B. t. u., the standard prescribed by the Legislature; and that at $1 for 1,000 cubic feet, the prescribed rate for gas of any of those standards, the return would be insufficient. Plaintiff contends that such figures are the result of experience.

The statute in question, not only provided the rate to be charged, but also fixed the standard of gas to be furnished at 650 B. t. u., the cost of manufacturing which, evidence was produced to show, would be greatly increased.

All the parties apparently tried the case before the master, so far as the taking of testimony was concerned, upon the theory that both provisions as to price and standard took effect immediately, whatever change there may have been in their attitude in argument after all the testimony was taken.

Evidence was also produced showing that a readjustment of the appliances used by the consumers could not be effected at once, and that to furnish gas of 650 B. t. u. without first readjusting the appliances of the consumers to utilize the same would endanger the health, if not the life, of the community.

Reluctant as any court should be to declare a statute of this character confiscatory until it has been demonstrated so to be during a test period, I am of the opinion that plaintiff in the action at bar has brought itself within the exception to the general rule which is laid down in Willcox v. Consolidated Gas Co., supra.

Further consideration will be given to the construction of the statute, after consideration of the evidence which it is alleged tends to show its confiscatory nature.

The master has so thoroughly examined and reported as to the facts that I shall content myself with stating only such facts as may be necessary in the determination of the questions raised by the exceptions.

Prior to and at the time of the incorporation of the plaintiff in September, 1895, under the Transportation Corporations Law of the state of New York, for the purpose of manufacturing and supplying gas in what is now the borough of Brooklyn, New York City, there were, in the portion of that territory known as the city of Brooklyn, seven corporations engaged in serving gas, to wit: The Nassau Gaslight Company, the People's Gaslight Company, the Metropolitan Gaslight Company, the Williamsburg Gaslight Company, the Brooklyn Gaslight Company, the Fulton Municipal Gas Company, and the Citizens' Gas Company. These companies were in active competition,

in some instances invading each other's territory, 2, 3, and even 4 mains existing in some streets, and engaged in a rate war.

Apparently the plaintiff corporation was organized for the express purpose of acquiring the properties of these corporations, and the purpose was consummated on November 4, 1895, by the simple process of the plaintiff purchasing the assets of the several corporations, for which it paid in stocks and bonds of the plaintiff.

The purchase price paid to the several corporations was the result of negotiations after investigation by committees of the various companies' reports to their boards of directors, and resolutions of such boards regularly adopted.

The plaintiff took possession of all the assets, tangible and intangible, of said vendor corporations, except the stocks and bonds forming the purchase price, which they had distributed to their stockholders, and thereafter the plaintiff served the community with gas and continues so to do.

[9] The plaintiff contends that the franchises possessed by the said vendor corporations, which were acquired by it and entered on its books on November 4, 1895, as capital assets, at a valuation of $3,050,000, should be included among the other assets of the plaintiff, used and useful in its business, and that the fair value of the same should be included in arriving at a rate base for the purpose of this action. The master reported adversely to this contention, and the plaintiff excepted.

It may be conceded, as urged by the plaintiff, that these franchises constituted property which would survive the dissolution of the corporation possessing the same (People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684), and that they were property the acquisition of which would support the issue of capital stock (Rafferty v. Buffalo City Gas Co., 37 App. Div. 618, 56 N. Y. S. 288), and that they were property which might be the subject-matter of a special franchise tax under the Tax Law of the state of New York (People ex rel. Metropolitan Street Railway Co. v. State Tax Commission, 199 U. S. 1, 25 S. Ct. 705, 50 L. Ed. 65, 4 Ann. Cas. 381); yet the fact remains that nothing was paid by any of the vendor companies for such franchises to the franchise-granting power, and therefore no valuation on the same can be included in the rate base (Spring Valley Waterworks Co. v. City of San Francisco [C. C.] 192 F. 137; Cumberland T. & T. Co. v. City of Louisville [C.

C.] 187 F. 637; Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 655, at page 669, 32 S. Ct. 389, 56 L. Ed. 594).

The test in the action at bar is not what plaintiff paid for them, nor what may be their present value, but what did the vendor companies pay for them?

I can find no authority supporting plaintiff's contention. I cannot agree with plaintiff that Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, can be considered as authority for the inclusion of the value of said franchises in the rate base in the action at bar.

In that case, chapter 367 of the Laws of the state of New York of 1884, passed after the incorporation of the Consolidated Gas Company, which authorized corporations engaged in manufacturing to consolidate, and permitted the issuance of capital stock by the consolidated corporation not "larger in amount than the fair, aggregate value of the property, franchises and rights of the several companies thus to be consolidated," was in force.

That statute further prescribed a means of ascertaining the fair aggregate value of those properties, franchises, and rights, viz., through the action of the directors of the various companies, supplemented by the approval of the stockholders in each instance. The Consolidated Gas Company of New York availed itself of this statute, and six gas companies in the city of New York were consolidated into the Consolidated Gas Company of New York, and the franchises and rights of the constituent companies were, by the method prescribed by the statute, valued at $7,781,000, and capital stock of the consolidated corporation was issued accordingly.

In 1885 the capitalization of the corporation was investigated by a committee of the Legislature of the state of New York appointed for that purpose, which concluded that "this state of facts cannot be called a violation of the law that expressly authorized it to be done."

The Supreme Court of the United States, in that case, accepted the valuation of the franchises fixed and agreed upon under the act of 1884 as conclusive at that time, because the agreement regarding it has been always recognized as valid, and the stock had been largely dealt in for more than 20 years before that time on the basis of the validity of the valuation and of the stock issued by the company, and the court made it clear in its opinion that the decision was founded upon the peculiar facts of that case and is not to be regarded as a precedent in cases involving the valuation of franchises generally.

That the decision of the Supreme Court in that case was limited to the peculiar facts therein shown, and not intended to change the rule, seems to have been generally accepted. Lincoln Gas & Electric Light Co. v. City of Lincoln (C. C.) 182 F. 926; Bronx Gas & Electric Co. v. Public Service Commission, 190 App. Div. 13, 180 N. Y. S. 38.

That it was not intended by the decision in that case to invade or modify the general rule further appears by the decision of the Supreme Court itself in Georgia Railway & Power Co. v. Railroad Commission of the State of Georgia, 262 U. S. 625, at page 632, 43 S. Ct. 680, 67 L. Ed. 1144.

Chapter 367 of the Laws of 1884, referred to by the Supreme Court, was repealed by chapters 563 and 567 of the Laws of 1890 before the plaintiff in the case at bar was incorporated, and therefore plaintiff can claim no right under that statute.

At the time the plaintiff acquired the assets of the seven corporations in November, 1895, there were three different methods which it could have pursued; the procedure prescribed and the rights given being different in each statute.

Section 13 of chapter 567, Laws of 1890 (Business Corporation Law), authorized a consolidation under which a new corporation would have entirely supplanted the consolidated corporations, and that this was not done is shown by the decrees of dissolution of the vendor corporations, granted in actions brought by the Attorney General of the state of New York for that purpose in the following year.

Section 58 of chapter 564, Laws of 1890 (Stock Corporation Law), as added by Laws 1896, c. 932, § 1, authorized a merger under which there would have been the survival of one and the obliteration of the others. Irvine v. New York Edison Co., 207 N. Y. 425, 101 N. E. 358, Ann. Cas. 1914C, 441. This likewise was not accomplished.

Section 33 of chapter 564, Laws of 1890 (Stock Corporation Law), as added by Laws 1893, c. 638, § 1, authorized a simple purchase, and this was the method pursued by the plaintiff, which acquired by conveyance the property, franchises, and rights of seven other corporations; all eight corporations remaining in existence. No method of

procuring a valuation upon the franchises conveyed was provided in the statute, nor did it authorize the issue of capital stock in the manner provided in chapter 367 of the Laws of 1884.

In only two particulars can I find any analogy between the facts in the instant case and that of the Consolidated Gas Company as to franchises, and those are that in neither were special stocks issued for the franchises, and in both the stock issued had been largely dealt in for more than 20 years past, and these are not sufficient to bring the case at bar under the exceptions to the rule laid down in the Consolidated Gas Company Case.

I therefore sustain the master, and hold that the value of the franchises cannot be included in the case at bar in making up the rate base of the plaintiff.

[10] It is not the province of this court to prescribe rates; the question with which we are concerned is to determine whether the rates prescribed by the Legislature are confiscatory.

[11] The rule to be followed in the case at bar is to ascertain the fair value of the property used and useful by the plaintiff in serving the public, as it is upon that fair value that the plaintiff is entitled to a fair return.

[12] That fair value cannot be determined by considering only the costs of replacement less depreciation, but we must also consider, if they can be ascertained, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under the particular rates prescribed by the statute, and the sum required to meet operating expenses, together with such other relevant facts as may be available, giving such weight as may be just and right in each case. Smyth v. Ames, 169 U. S. 546, 18 S. Ct. 418, 42 L. Ed. 819; The Minnesota Rate Cases, 230 U. S. 434, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; San Diego Land Co. v. National City, 174 U. S. 757, 19 S. Ct. 804, 43 L. Ed. 1154; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Waterworks & Improvement Co. v.

Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Georgia Railway & Power Co. v. Railroad Commission of Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144.

Original cost to the vendor companies was not shown notwithstanding the industrious efforts of the plaintiff, supplemented by the efforts of the defendants, and in my opinion it is incapable of proof. The ledger balances of such companies and the opening entries in the plaintiff's books of the same date were, however, produced in evidence. These ledger balances of the vendor companies carried the assets acquired by the plaintiff at $16,524,095.35, included in which was an item of $1,250,000 for franchises and rights, carried on the books of the Citizens' Gas Company of Brooklyn, one of the vendor corporations. Deducting this item leaves $15,274,095.35, at which sum the physical assets conveyed to plaintiff were carried by the vendor corporations.

The original journal entries of the plaintiff on their purchase of the same properties indicated an aggregate valuation of $28,799,731.92, in which was included $3,050,000, the valuation of "Franchises" and "Rights." The last item had not appeared upon the books of the vendor corporations with the exception of $1,250,000, hereinbefore referred to. Deducting $3,050,000, the valuation given by plaintiff to the physical property so acquired was $25,749,731.93.

It having been found to be impossible to establish the actual original cost of the vendors, plaintiff called an expert who testified on the basis of incomplete books of the vendor corporations, the general trend of prices during the corporate lives of such corporations to the date of conveyance, and, because of being unable to ascertain the dates of actual construction applying index values throughout the period, that the cost of that property should have been $23,976,790, excluding land, franchises, working capital, and going concern value. This same witness testified that in his opinion the reproducible value of these properties in November, 1895, was $17,996,216, excluding land, franchises, working capital, and going concern value. The vendors carried on their books the land sold to plaintiff at a valuation of $2,619,226. The plaintiff, in its opening journal entries, valued the same property at $5,349,400.

At the time the purchase was consummated the aggregate par value of the outstanding stock of the vendor companies was $9,970,000 and of bonds $3,900,000, making

in all $13,870,000, and the approximate market value was $20,000,000.

Defendants contend that in attempting to arrive at cost or book value, there should be deducted from $28,799,731.92, the valuation at which the purchased properties were originally entered on the books of the plaintiff, the sum of $10,475,636.57, in addition to the sum of $3,050,000, the valuation of franchises and rights, which the master has already deducted, which would leave $15,274,095.35, the sum which defendants contend should be taken as showing cost or book value at that time.

To support this, defendants point to the testimony of a vice president of the plaintiff before a legislative committee in 1905, when, in substance, he said, in reply to questions about the difference between the closing entries in the books of the vendor companies and the opening entries in plaintiff's books, that $3,050,000 represented franchises and rights, $4,000,000 was added to the street main account, and $5,000,000 was added to the plant account for the right to do business, a total of about $12,000,000.

This does not, however, seem to me to be conclusive, because the witness in his testimony before the committee was evidently in error when he said that $5,000,000 was added to the plant account, as the evidence shows that the closing entry on the books of the vendor corporations was "Plant and Patents," $9,731,384.83, and the plaintiff's opening entry was $10,687,853.31, a difference of less than a million instead of five. Furthermore, substantially all of the items seem to have been written up, and, while there is a large increase in the valuation of street mains, there is also an increase of approximately $2,700,000 in the value of land.

The transaction between the plaintiff and the vendor companies was not a consolidation nor a merger but a simple purchase, preceded by negotiations, and I see no reason to believe that the plaintiff paid to the vendor companies more than it considered a fair price for their assets.

[13, 14] In any event, however, it is the property, and not the original cost, of which the owner may not be deprived, and our object is to determine the value of the property in present money; original cost being but one of the elements to be considered. Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission et al. (D. C.) 292 F. 139; New York Telephone Co. v. Prendergast (D. C.) 300 F. 822.

Historical cost may be more readily traced after December 31, 1908, because on January 1, 1909, a uniform system of accounts was promulgated by the Public Service Commission.

By stipulation the withdrawals from fixed capital between November 4, 1895, and December 31, 1908, were fixed at $4,000,000. Between November 4, 1895, and December 31, 1908, the plaintiff purchased the Equity Gas Works, and paid therefor $568,066. During the same time the plaintiff had also acquired the entire capital stock of five subsidiary corporations, viz. Jamaica Gaslight Company, Richmond Hill & Queens County Gaslight Company, the Woodhaven Gaslight Company, the Newtown Gaslight Company, and the Flatbush Gas Company.

These corporations, while maintaining a separate corporate existence, manufacture no gas, but purchase the gas from the plaintiff which they distribute to their consumers, and certain properties owned by the plaintiff are used by these subsidiaries. The actual cost of such properties so allocated cannot be definitely determined, but I agree with the master's estimate that the cost of the properties used by the subsidiaries should be 10 per cent. of the value of plaintiff's property.

I agree with the master's statement that an analysis of the books of the plaintiff would indicate (though not establish) the net cost of the physical properties, including the Equity Gas Works, and excluding property utilized by the subsidiaries on June 1, 1923, was $38,517,199.94.

On June 1, 1923, the outstanding stock at par and bonds at face value of the plaintiff aggregated $46,579,000, and their market value was $48,750,000. On that day the fixed capital of the plaintiff, as the same appeared upon its books of account, was $46,149,133.93, excluding any value for franchises and rights.

The plaintiff is a large company, and on June 1, 1923, operated six manufacturing plants, having an aggregate daily capacity of nearly 125,000,000 cubic feet; its maximum daily send-out during the winter of 1923 and 1924 was nearly 95,000,000 cubic feet. Its properties are fully described by the master.

[15] Exception has been taken to the findings of the master as to the various items which go to make up the cost of replacement.

The defendants contend that the master erred by failing to deduct from the amounts as found by him a proper amount for depreciation of the several items, and ask this

court to deduct depreciation from what it may find to be the cost of replacement of the several items, but no evidence was offered by the defendants to show that there was any depreciation or what was the amount thereof, either in rate based on percentages or in any fixed sum.

As I understand the contention of the defendants, it is that the court should take judicial notice of the fact that all things depreciate in value, and cite Knoxville v. Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371.

Plaintiff contends that the most recent decisions hold that depreciation can be found only if it exists in fact, based on definite testimony of competent experts who have examined the structural units and speak concerning observed conditions, and cite Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075; New York Telephone Co. v. Prendergast (D. C.) 300 F. 822, Westinghouse Electric & Mfg. Co. v. Denver Tramway Co. (D. C.) 3 F. (2d) 285.

Even in Knoxville v. Water Co., supra, cited by the defendants as supporting their contention, we find that testimony was given showing depreciation, because at page 14 of 212 U. S. (29 S. Ct. 152) the court said: "After the company had closed its case the city undertook to determine the present value of the company's property by the plain method of ascertaining the cost of reproduction, diminished by depreciation."

Not only did the defendants fail to call any witnesses to show depreciation, but the witnesses for the plaintiff, as to nearly all items, testified that there was none.

The properties of the plaintiff are maintained in a high order of efficiency, and that they might have been as good as new for the purposes of the company on June 1, 1923, is not improbable when you consider the narrow line between replacements and repairs, and it must be that parts are being replaced daily and charged as repairs, so that, the plant being kept in a high order of efficiency by such replacements, the plaintiff's witnesses do not consider that there is any depreciation. The witnesses do in some instances testify to sums necessary to put portions of the property in condition equal to new, and these deductions must be made.

The defendants now claim that the master erred in not making deductions for depreciation as to the several items making up the cost of replacement, but I cannot agree with them because, if they desired such a finding,

the defendants, with the large corps of experts under their control, could have easily shown the fact, if such it be, and the basis on which depreciation should be figured, and, having failed to make any such showing, they cannot complain because the master failed to make such findings, as it appears to me that in his finding of a fair value much lower than the cost of replacement as found by him, he must have made all the allowance for depreciation that was warranted by the evidence.

[16] Plaintiff seems to contend that, because no evidence was offered by any experts called by the defendants as to values, this court is bound to accept the testimony of the plaintiff's expert witnesses and allow the amounts testified to by such experts, and cites Ohio Utilities Co. v. Public Utilities Commission of Ohio, decided by the United States Supreme Court March 2, 1925, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656. But that case does not seem to be in point, because in that case there was a valuation by the engineers of the commission, which was acquiesced in by the company, and no substantial evidence was found in the record to the contrary.

In the case at bar, while the defendants called no expert witnesses, they did cross-examine the plaintiff's experts, and the court has a right to consider the testimony given in the light of the cross-examination, and accord to it such weight as it deems proper. Head v. Hargrave, 105 U. S. 45, 26 L. Ed. 1028; The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937.

The defendants or one of them have excepted to the finding of the master as to nearly if not all of the elements that go to make up the cost of replacement as found by the master, and the plaintiff has likewise excepted to his findings as to some of them.

[17] As I understand the law, it is my duty to give my individual judgment in this matter. I have therefore examined the evidence as to each of such items.

The evidence on which the findings must be based is largely that given by the plaintiff's witnesses, as the defendants called but few witnesses to contradict them.

The defendants contend that allowances should be made for depreciation as to many of the items, but there is no evidence in the record which fixes any basis for determining depreciation. The defendants cross-examined the plaintiff's witnesses, but such cross-examination does not furnish a basis for any

specific deductions other than those made by the master.

The amount for repaving under the item for services was not for replacing paving for the whole system, nor in any cases where no pavement existed at the time, or where an improved pavement had been laid since the services were originally installed, but the witness testified that it was for the same kind of pavements which were cut and replaced when the services were originally installed.

No finding deducting anything from the item for services when the same were laid on the consumers' property inside the building line can be based on the fact that some consumers had contributed an amount which was not definitely shown on account of the whole expense of installing services, because that would not be a proper deduction, the only deduction that could properly be made would be the value of the property, if any, included in that item which belonged to the consumers, and no testimony was offered to prove that title to any was in the consumer. The testimony shows that all replacements of services were made at the expense of the company, and there is no proof of their intention to give them to the consumer when they were laid on the consumer's property at his invitation and with his license.

From the master's opinion, it would seem that he had intended to find that $7,000,000 was the cost of reproducing buildings and structures other than manufacturing plant and stations, after deducting $20,756, the amount which the expert had testified it would be necessary to expend to restore these buildings to a condition equal to new, and that he had also intended to find that $14,-500,000 was the cost of reproducing manufacturing plant, stations, and gas holders, after deducting $528,368, the amount which the expert has testified it would be necessary to expend to restore those properties to a condition equal to new; but, inasmuch as he made specific findings Nos. 76 and 77, that said several sums should be deducted from the reproduction cost, he must be held to have meant that they were to be deducted from such sums.

[18] The plaintiff contends, and I believe properly, that the assessed values for the purpose of real estate taxation of the land and buildings as of October 1, 1922, were improperly received over its objection. No assessor was called to testify and qualified as an expert, and, as I read the record, the concession of the plaintiff was only as to the fact of the assessment and not as to its admissibility.

Even if the assessed values were admissible they would not furnish a safe guide either as to land or buildings, and that is especially true as to buildings, because too many elements enter into an assessment for real estate taxation which have no place in the determination of the value of real estate, either in the case of private sale, condemnation or confiscation.

However, the cross-examination of the experts showed that in some instances the sales on which they relied, or which they claimed assisted them, warranted the master in reducing their valuations, and I therefore accept the valuation found by him.

I do not agree in every instance with the reasoning of the master, but it does seem to me that the evidence supports his findings of the reproduction cost, and, while he may have made a slight sacrifice to round numbers, the result would not be changed by carrying them out. The amounts found by him are as follows:

| | |
|---|---:|
| Land | $ 3,000,000 |
| Manufacturing plants, stations, and holders | 14,500,000 |
| Buildings and structures other than manufacturing plants and stations | 7,000,000 |
| Mains | 18,000,000 |
| Services | 6,250,000 |
| Meters | 4,000,000 |
| Overhead and financing | 11,000,000 |
| Equipment | 600,000 |
| | $64,350,000 |

From which must be deducted the amounts deducted by the master in findings Nos. 76 and 77 as necessary to restore buildings and structures other than manufacturing plants and stations to a condition equal to new $ 20,756
And to restore manufacturing plant, stations and gas-holders to a condition equal to new 528,368
Amounting in all to ........... 549,124

Total reproduction cost...... $63,800,876

From this total there must be deducted the value of the property owned by the plaintiff but used by the subsidiaries, as reported by the master, amounting to $6,498,090, and there remains the sum of $57,302,786, which I find to be the reproduction cost as of June 1, 1923.

The following elements must be considered to determine fair value. Original cost not established but indicated by an analysis of

the books of the plaintiff, $38,517,199.14; book value, $46,149,133.33; capitalization about $46,500,000, represented by outstanding stocks and bonds with a market value of $48,750,000; reproduction cost, $57,302,-786.

All the properties are serviceable and in excellent condition, although some are half a century old; some being more serviceable than others because they are more modern. Original cost in this instance is at best but an estimate, and cannot be a fair measure of value because it is too remote, and it does not seem to me that reproduction cost, as found, can be the fair value of the property, because no one would purchase physical property of the age of this property at the same price they would pay for new; therefore, taking into consideration all the elements which must be considered (Smyth v. Ames, supra, Georgia Railway & Power Co. v. Railway Commission of Georgia, supra, and Bluefield Land & Water Co. v. Commission, supra), I agree with the master that the fair value of these properties can be fixed at $50,000,000 as of June 1, 1923.

[19] What we are to find is the fair value of the property which the plaintiff was devoting to the public service, and not the value of what the defendants may have considered an efficient substitute.

In my opinion Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, is not an authority in support of defendants' contention, because in that case the court was dealing with an established fact, while in this case it would be a matter of speculation.

I am of the opinion that there is a going value to the property of the plaintiff, and, while it may be greater, I do not feel that on the evidence offered in the case at bar it could be fixed at more than $6,000,000, if on the evidence it could be fixed at any specific sum; and, if there was something for going value included in the price paid by the plaintiff, in its stocks and bonds, to the vendor corporations in November, 1895, it is more than covered in this amount.

Therefore it seems to me that the master was right in eliminating any allowance for going value in the case at bar, in ascertaining reproduction cost or in adopting a rate base, and I shall follow that course, in the belief that by so doing the rate base as found by me is established beyond a reasonable doubt.

I agree with the master and allow $5,000,-000 for working capital. Adding this to $50,000,000, which I have found to be the fair value, a rate base of $55,000,000 is established as of June 1, 1923.

Between June 1, 1923, and December 31, 1923, additions were made to the capital, after deducting withdrawals of the net amount in the aggregate of $3,856,971, and deducting therefrom the amount of $764,458, allocated to the use of subsidiaries. leaves $3,092,513, which, added to $55,000,000, makes the rate base $58,092,513 as of December 31, 1923.

No argument was presented, either orally or by brief, on behalf of the defendants constituting the Public Service Commission against the findings of the master as to the cost of manufacturing and distributing gas of any of the standards described, nor as to the relations of plaintiff with and charges to the subsidiary companies. It may therefore be assumed that the actions of the plaintiff with reference to those subjects, as found by the master, are approved by the commission charged by law with the regulation of all matters relating to plaintiff. The only argument against said finding was made, both orally and by brief, on behalf of the defendant Attorney General.

The subsidiary companies do not manufacture any gas, but all the gas sold by them is manufactured by the plaintiff and sold to the subsidiaries, and the books of the plaintiff properly show the cost of gas distributed to its consumers.

The plaintiff's methods in making purchases were efficient, and the prices paid reasonable, as exemplified in the reduced price at which oil was obtained, and this is not controverted by any evidence offered by the defendants.

The relations between the plaintiff and its subsidiaries and their methods of fixing the prices to be paid by the subsidiaries are not properly subject to criticism. The difference between the amount of gas that had been served during the year, as found by a calculation at the close of the year, and the amount estimated at the beginning of the year as the amount that would be required, was too small to justify recasting the system of accounting, and I see no reason for requiring it.

[20] The plaintiff is operating several plants and the costs are not uniform, but all of these plants are efficiently operated, although they are not equally well equipped. In some instances the costs of manufacture were higher because certain repairs were in progress during the period under considera-

tion, but the consumer cannot get the benefit of lower cost and more efficient service unless the plants are kept in repair, and the attainment of greater efficiency is the motive for making the repairs, which will reduce the cost of operation. The making of repairs must be going on each year in one plant or another, if efficiency is to be preserved, and the plaintiff should not be penalized for keeping its plants efficient.

The plant where the cost of operation was the highest was the Equity, which serves a remote section of the territory in which plaintiff furnishes gas, and I find nothing in the evidence which warrants a finding that this plant could be dispensed with, or that cost of operation of this plant should be standardized on the basis of the cost of operation of a large plant which can serve the territory adjacent to it, and which is more favorably located.

Therefore, in the face of the uncontroverted evidence of Col. Miller, that he had compared the operating costs of the plaintiff with the operating costs of the companies throughout the Metropolitan district, and that these costs of the plaintiff were reasonable, and the results of such comparisons did not indicate any unusual feature, I can see no reason or justice in establishing one or a number of them as a standard, or in refusing to base the cost of operation on the cost of producing the entire amount of gas sold by the plaintiff, no matter where manufactured.

I agree with the master that the books and records of the company are properly kept and the plants are efficiently operated, and the plaintiff offered evidence to show the actual results of operation for 1922 and 1923.

To calculate repairs on the basis of the average for 5 years shows but a negligible difference from a calculation as made by the plaintiff, but it might properly entail a consideration of varying costs of material and labor, without producing a result which would be as nearly accurate as that which was made by the plaintiff and approved by the master, as the evidence shows that we may reasonably assume that present prices will continue for some time. I therefore approve of the method pursued as proper.

[21] The Attorney General contends that unaccounted for gas, that is due to leakage, condensation, expansion, and contraction, among other things should be allowed at an arbitrary figure of 5 per cent., but I do not agree with him, because in my opinion the proper method is to allow it on the basis of the companies' own records, which show the results of experience.

[22] In this action, where the question to be determined is whether or not the rate is confiscatory, I do not think we should allow the sum of $108,668.23 spent by plaintiff in making adjustments to conform to the order of the commission which went into effect October 1, 1922, nor the sum of $94,524.89, estimated as the cost of maintaining this action, because they are abnormal and should not be regarded as a part of the cost of manufacture for this purpose.

[23] The item of uncollectible bills was properly allowed by the master, and the gross earnings tax was properly allowed at $105,625.33.

Counsel for the Attorney General contends that the reasonable and necessary cost of making and distributing gas should not have exceeded 77.96 cents per thousand cubic feet sold.

The calculation and argument presented in its support show industry on the part of the attorneys who appeared on the argument, but did not, in my opinion, find support in the evidence taken on the trial; and this case, like all others, must be determined on the evidence and not on the argument of counsel.

The principal points of objection taken by the Attorney General to the evidence of cost of manufacture and distribution offered by the plaintiff—namely, that the cost of operation should not be based on the costs of all the plants, but on that of four of the plants which he deems the most efficient, that unaccounted for gas should not be allowed on the basis of experience of the company, but at an arbitrary figure of 5 per cent., and as to gross earnings taxes—have already been discussed and decided.

The miscellaneous objections seem to have been considered and properly determined by the master, and but one of them need be mentioned.

[24] Some years ago a holder was built on the lands of, and in the name of, the Newtown Gas Company. Plaintiff loaned the Newtown Gas Company all of the money to build the same, and charges the Newtown Gas Company 6 per cent. interest for said loan. The plaintiff uses the holder which it maintains, and pays 8 per cent. for its use.

This transaction does not present to my mind anything requiring correction, especially when you consider the statement from the attorney for the defendant Attorney General that the Newtown Gas Company had

no need of such holder, from which I understand that it was built for the use of plaintiff, the tenant, but it simply represents the established difference between interest rates and rental value economically figured.

I therefore approve the finding of the master that the reasonable and necessary cost to furnish gas of a standard of not less than 650 B. t. u., as required by the statute, would be at least 93.56 cents per thousand cubic. feet.

The plaintiff, in 1923, received from the sale of residuals and gas appliances $343,-943, which is equivalent to 2.24 cents per thousand cubic feet of gas sold.

Modifying the entire operating income of the plaintiff by the lower price at which it sells gas to the city of New York, it equals $1.0206 per thousand cubic feet of gas sold, at a cost of 93.56 cents per thousand cubic feet.

In order to furnish gas to the consumer at 537 B. t. u., it is necessary that the gas at the works should contain 550 B. t. u. Taking the lower cost of oil in 1923 rather than the price actually paid in 1922 and 1923, the cost of manufacture and delivery of 537 B. t. u. gas would be approximately 86.85 cents per thousand cubic feet, disregarding any increase in the required quantity of coal and the loss of volume from the decrease in the quantity of oil.

[25] On the question of the rate of return to which plaintiff is entitled, the only evidence given was that of the expert witness called by the plaintiff, who placed it at 8 per cent., which was approved by the master in his opinion.

The defendants, by way of argument only, because they called no witness, contend that the act cannot be held to be confiscatory if plaintiff receives a return of 6 per cent.

Whatever force there might be to the argument of the defendants under some circumstances, it seems to be lost in the instant case, when you consider that bonds issued by this plaintiff while under the regulation of the defendant Public Service Commission, and with its approval, bear interest at the rate of 7 per cent. per annum, showing clearly that the lending public did not consider 6 per cent. as an adequate return.

Therefore, on the evidence in the instant case and on consideration of the opinions of the courts in New York & Queens Gas Co. v. Prendergast (D. C.) 1 F.(2d) 351, Bronx Gas & Electric Co. v. Prendergast (D. C.) 1 F.(2d) 377, New York Telephone Co. v. Prendergast (D. C.) 300 F. 822, Bluefield

Waterworks & Imp. Co. v. Public Service Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176, and Consolidated Gas Co. v. Prendergast (D. C. S. D. N. Y.) 6 F.(2d) 243, decided April 22, 1925, I see no reason to disagree with the opinion of the master.

[26] In the case at bar, however, at the rate of $1 per thousand cubic feet, the plaintiff cannot obtain a return even approximating 6 per cent. at any standard, even of 537 B. t. u.

As I construe this statute the plaintiff is required to deliver to the consumer gas containing the statutory thermal content. To do this, the gas at the point of manufacture must contain a greater thermal content than prescribed by the statute, as there is a loss in the transmission of gas due, among other things, to condensation.

The sales of gas by the plaintiff aggregate 15,300,373 thousand cubic feet. The yield to the plaintiff in the several alternatives would be as follows:

The cost of manufacture and distribution of 650 B. t. u. gas being 93.56 cents per thousand cubic feet, and the income from the sale of gas, gas appliances, and residuals aggregating $1.0206, the yield would be 8.5 cents per thousand cubic feet or $1,300,531.-71 per annum, the equivalent of 2.365 per cent. upon $55,000,000, the rate base as of June 1, 1923, or of 2.24 per cent. upon $58,-092,513, the rate base as of December 31, 1923.

If plaintiff should continue to manufacture and distribute 587 B. t. u. gas, its 1923 standard, the cost would be 90.49 cents per thousand cubic feet, and, at the rate nominated in the statute, it would yield, $1,770,253.16 per annum, or 3.22 per cent. upon $55,000,-000, the rate base as of June 1, 1923, or 3.05 per cent. upon $58,092,513, the rate base as of December 31, 1923.

If the statute was so construed as to permit plaintiff to manufacture and distribute 537 B. t. u. gas, the cost would be 86.85 cents per thousand cubic feet, and, at the price prescribed in the statute, the yield would be $2,-327,187 per annum, or 4.23 per cent. upon $55,000,000, the rate base as of June 1, 1923, or 4 per cent. upon $58,092,513, the rate base as of December 31, 1923.

The property of the plaintiff will be confiscated by the operation of the statute in question. In fact, if the plaintiff be required to manufacture and distribute 650 B. t. u. gas at the rate prescribed by statute, the yield would not be sufficient to pay the sum of $1,640,530, the yearly interest on the face

value of the bonds issued by the plaintiff, to say nothing about paying any dividend on the capital stock.

The face value of bonds issued by the plaintiff is less than the amount which the defendants contend is the fair value of plaintiff's said property used and useful for the service of the public.

The defendant Attorney General seems to have dropped the contention he made before the master that there could be no confiscation until the plaintiff had exhausted its contingency account in making good any losses incurred by operating under the statute, and therefore the question needs no further discussion, and I will content myself with saying that I am in entire accord with the opinion of the master that to take any of this account is to take the property of the plaintiff and would be confiscation.

[27] The only subject remaining for consideration is the construction of the statute. The master has found it unconstitutional in its entirety. The defendant Attorney General contends that the provisions of the act are severable, and that, if the standard provision be found unconstitutional, the rate should still stand.

The statute, to my mind, clearly had but one purpose, which was to compel the gas companies of the city of New York to furnish gas of a standard of 650 B. t. u. at the unchangeable rate of $1 per thousand cubic feet.

However you may attempt to construe the provisions of the act, they are found to be correlated, because, while the first provision is as to price, clearly it can only be gas of the standard described in the section which is permitted to be sold for that price, and the second provision establishes the standard of quality of gas to be sold at that price, while the third provision prohibits the Public Service Commission from increasing the statutory rate for gas permitted to be sold under said section.

The last provision was undoubtedly inserted to repeal so much of section 72 of the Public Service Commission Law, supra, as gave the Public Service Commission the right to change the rate which had been fixed by statute.

The title of the act is "An act to amend the Public Service Commission Law, in relation to the charge for illuminating gas in cities containing a population of one million or over." The sole purpose, as expressed in the title of the act, being to amend in relation to a charge for gas, the require-

7 F.(2d)—43

ment as to standard of necessity must be an integral part of the charge for gas describing what standard of gas must be furnished for the specified rate.

To read the act as suggested by the defendant Attorney General would lead to a condition never contemplated by the Legislature, because, instead of obtaining better gas, the consumer would not be able to obtain gas of as good a quality as was possible before the passage of the act.

In the case at bar, it appears that the act is confiscatory, even if gas of the standard of 537 B. t. u. is required to be furnished for $1 per thousand cubic feet; therefore, if the standard be declared unconstitutional and the provision as to rate sustained, the Public Service Commission would be obliged to establish a standard which they could constitutionally require to be furnished for the prescribed rate, and that would mean gas of a much lower standard than that required at the time of the passage of the statute.

The defendant Attorney General seems to contend that, if the standard be declared invalid and the rate sustained, the former order of the Public Service Commission, dated August 30, 1922, fixing the standard at 537 B. t. u., will at once be restored; but that does not seem to me so, because that order was abrogated by the commission's order dated June 4, 1923, which in part reads as follows:

"Ordered: That each and every gas corporation engaged in the business of manufacturing, furnishing, or selling illuminating gas in the city of New York be and hereby is required forthwith to comply with such statute, and be and hereby is authorized to file and publish a new schedule of its rates for gas effective forthwith in accordance with said statute."

The act further provides, "This act shall take effect immediately," and that it applied to standard and rate, and was so construed by the Public Service Commission, appears from their order of June 4, 1923, supra.

If this language is to be construed as it reads, it means that it was intended to have the act take effect on the day of its passage. If this construction be correct, then the evidence clearly shows that it was impossible to make the necessary changes in appliances to comply with the act, and to have attempted to furnish 650 B. t. u. gas without making such changes would have been inimical to the property and even to the lives of the consumers, and it was impossible to comply therewith.

There was no place described in the act where the standard was to be measured, and, if it was held this meant the place of delivery to the consumer, it would have meant at least 665 B. t. u. at the place of manufacture.

The Attorney General advances the theory that there should be read into the statute an intention by the Legislature to allow a reasonable time to the plaintiff and other gas companies thereby affected to make the necessary adjustments of appliances. I can find no authority for any such construction, because, even the inclusion of express language to that effect in the statute would leave the plaintiff in a position where it could not know in advance whether or not its act was in violation of the statute.

The criminality of an act cannot depend upon whether a jury might think it reasonable or unreasonable. Tozer v. United States (C. C.) 52 F. 917; Chicago & N. W. Railway Co. v. Dey (C. C.) 35 F. 866, 1 L. R. A. 744. This theory advanced by the Attorney General cannot be sustained. The provisions of the statute as to rate and standard are not severable. New York & Queens Gas Co. v. Prendergast (D. C.) 1 F.(2d) 351.

The rate provided in the statute would deprive the plaintiff of its property without due process of law, if the gas required to be furnished be of the standard prescribed in the statute, or even of the standard required by the order of the Public Service Commission of August 30, 1922, and the provision of the statute with reference to standard is incapable of performance.

Chapter 899 of the Laws of New York 1923, as worded, is not separable into parts, but in its entirety violates section 1 of article 14 of the federal Constitution.

The parties may submit a proposed decree and findings in the form of final decree, in accordance with the views herein indicated, modifying the report, and, as so modified by such decree, the report will be in all respects confirmed.